**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 13, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KANE COUNTY UTAH, a Utah
political subdivision; KANE
COUNTY BOARD OF
COMMISSIONERS; GARFIELD
COUNTY, a Utah political
subdivision; GARFIELD COUNTY
BOARD OF COMMISSIONERS,

      Plaintiffs-Appellants,

and

KANE COUNTY WATER
CONSERVANCY DISTRICT, a Utah
Water Conservancy District,

      Plaintiff,

v.

KEN SALAZAR, in his official
capacity as Secretary of the Interior;
UNITED STATES DEPARTMENT
OF THE INTERIOR; MIKE POOL, in
his official capacity as Acting Director
of the Bureau of Land Management;
BUREAU OF LAND
MANAGEMENT; SELMA SIERRA,
in her official capacity as the Utah
State Director of the Bureau of Land
Management; RENE BERKHOUT, in
her official capacity as manager of the
Grand Staircase-Escalante National
Monument,

      Defendants-Appellees,

No. 07-4207 & 08-4014

NATIONAL TRUST OF HISTORIC
PRESERVATION; SIERRA CLUB;
SOUTHERN UTAH WILDERNESS
ALLIANCE; THE WILDERNESS
SOCIETY,

      Defendants-Intervenors-
      Appellees,

and

TROUT UNLIMITED,

      Amicus Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:05-CV-941-BSJ)**

---

Shawn T. Welch, (A. John Davis with him on the briefs), Holme, Roberts &
Owen, LLP, Salt Lake City, Utah, for Plaintiffs-Appellants.

David C. Shilton, (Ronald J. Tenpas, Assistant Attorney General; Thomas K.
Snodgrass, Attorney, Environmental and Natural Resources Division; Aaron P.
Avila, Attorney, Environmental and Natural Resources Division, with him on the
brief), Department of Justice, Washington, D.C., for Defendants-Appellees.

Edward B. Zukoski, (James S. Angell, Earthjustice, Denver, Colorado; Heidi
McIntosh and Stephen H. M. Bloch, Southern Utah Wilderness Alliance, Salt
Lake City, Utah, with him on the brief), Earthjustice, Denver, Colorado, for
Defendants-Intervenors-Appellees.

Drew Peternell, Trout Unlimited, filed an amicus brief is support of appellees.

---

Before **HENRY, BRISCOE,** and **LUCERO**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Plaintiffs Kane County, Utah, the Kane County Board of Commissioners, Garfield County, Utah, the Garfield County Board of Commissioners, and the Kane County Water Conservancy District filed suit against the Secretary of the Interior and other federal governmental officials alleging that a management plan adopted by defendants for overseeing the Grand Staircase-Escalante National Monument infringed upon plaintiffs' water rights and certain rights-of-way utilized by plaintiffs for purposes of public highways. The district court dismissed plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). Plaintiffs now appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I

*Rights-of-way over public lands pursuant to R.S. 2477*

"In 1866, Congress passed an open-ended grant of 'the right of way for the construction of highways over public lands, not reserved for public uses.'" S. Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735, 740 (10th Cir. 2005) (quoting Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by Federal Land Policy Management Act of 1976 (FLPMA), Pub. L. No. 94-579 § 706(a), 90 Stat. 2743). "This statute, commonly called 'R.S. 2477,' remained in effect for 110 years, and most of the

3

transportation routes of the West were established under its authority." Id. "In 1976, however, Congress abandoned its prior approach to public lands and instituted a preference for retention of the lands in federal ownership, with an increased emphasis on conservation and preservation." Id. at 741. "As part of that statutory sea change, Congress repealed R.S. 2477." Id. "There could be no new R.S. 2477 rights of way after 1976." Id. "But even as Congress repealed R.S. 2477, it specified that any 'valid' R.S. 2477 rights of way 'existing on the date of approval of th[e] [FLPMA]' (October 21, 1976) would continue in effect." Id. (quoting Pub. L. No. 94-579 § 701(a), 90 Stat. 2743, 2786 (1976)). Congress also directed that "[a]ll actions [taken] by the Secretary concerned under this Act [the FLPMA] shall be subject to valid existing rights." 43 U.S.C. § 1701 historical note (h).

*Creation of the Monument*

On September 18, 1996, President Clinton created the Grand Staircase-Escalante National Monument (Monument), located in Kane and Garfield Counties, Utah, to protect a "spectacular array of scientific and historic resources." 61 Fed. Reg. 50,223 (Sept. 18, 1996). In doing so, President Clinton proclaimed that "[a]ll Federal lands and interests in lands within the boundaries of th[e] monument [we]re [t]hereby appropriated and withdrawn from entry, location, selection, sale, leasing, or other disposition under the public land laws," and that "[l]ands and interests in land not owned by the United States s[hould] be

4

reserved as a part of the monument upon acquisition of title thereto by the United

States." Id. at 50,225. The proclamation did not, however, "reserve water as a

matter of Federal law." Id. As part of the proclamation, President Clinton

directed the Secretary of the Interior (the Secretary) to "prepare, within 3 years . .

. , a management plan for" the Monument. Id. Lastly, the proclamation provided

that the Secretary would "manage the [M]onument through the Bureau of Land

Management" (BLM). Id.

*The management plan for the Monument*

On November 15, 1999, the Secretary issued a final management plan (the

Plan) and record of decision (ROD) for the Monument. 65 Fed. Reg. 10,819 (Feb.

29, 2000).

The ROD, which was published as part of the Plan, stated, in pertinent part:

[D]iscussion of R.S. 2477 assertions in footnote 1 of Chapter 2 of the
Approved Plan has also been clarified to emphasize that nothing in
the Plan extinguishes any valid existing rights-of-way in Grand
Staircase-Escalante National Monument. Nothing in this Plan alters
in any way any legal rights the Counties of Garfield and Kane or the
State of Utah has to assert and protect R.S. 2477 rights, and to
challenge in Federal court, or any other appropriate venue, any BLM
road closures that they believe are inconsistent with their rights.

App. at 20 (citing ROD, p. ix).

The Plan, in a section entitled Transportation and Access, stated:

**TRAN-1** This Plan designates the route system for the Monument.
The transportation map (Map 2, in the back of the document) shows
routes that will be open for public use and those available for
administrative use only (see the **Administrative Routes and**

5

**Authorized Users** section for related decisions).  Any route not shown on Map 2 is considered closed upon approval of this Plan, subject to valid existing rights. [fn.1]

> [Footnote 1]  <u>Some government entities may have a valid existing right to an access route under Revised Statutes (R.S.) 2477</u>, Act of June 26, 1866, ch. 262, § 8, 14 Stat. 251, which granted "[the right-of-way for the construction of highways over public lands, not reserved for public uses.]"  As described in the United States Department of Interior, Report to Congress on R.S. 2477 (June 1993), claims of rights-of-ways under R.S. 2477 are contentious and complicated issues, which have resulted in extensive litigation.  See e.g., Sierra Club v. Hodel, 848 F.2d 1068 (10th Cir. 1988); Southern Utah Wilderness Alliance v. Bureau of Land Management, Consolidated Case No. 2:96-CV-836-S (D. Utah, filed Oct. 3, 1996, pending).  <u>It is unknown whether any R.S. 2477 claims would be asserted in the Monument which are inconsistent with the transportation decisions made in the Approved Plan or whether any of those R.S. 2477 claims would be determined to be valid.  To the extent inconsistent claims are made, the validity of those claims would have to be determined.  If claims are determined to be valid R.S. 2477 highways, the Approved Plan will respect those as valid existing rights</u>.  Otherwise, the transportation system described in the Approved Plan will be the one administered in the Monument.  Nothing in this Plan extinguishes any valid existing right-of-way in the Grand Staircase-Escalante National Monument.  <u>Nothing in this Plan alters in any way any legal rights the Counties of Garfield and Kane or the State of Utah has to assert and protect R.S. 2477 rights, and to challenge in Federal court or other appropriate venue, any BLM road closures that they believe are inconsistent with their rights</u>.]

The specific routes shown open for public use are based on a variety of considerations including what is needed to protect Monument resources, implement the planning decisions, and provide for the transportation needs of surrounding communities.  The basic philosophy in determining which routes will be open was to determine which routes access some destinations (e.g., scenic overlook, popular camping site, heavily used thoroughfare) and

6

present no significant threat to Monument resources. These routes will be open for public use. Routes that were not considered necessary or desirable (for resource protection purposes) will not be kept open for motorized and mechanized public access. In the event that Title 5 rights-of-way are issued or <u>in the event of legal decisions on RS 2477 assertions, routes will be governed under the terms of those actions</u>.

Grand Staircase-Escalante National Monument Management Plan at 46, available at http://www.blm.gov/ut/st/en/fo/grand_staircase-escalante/planning/ monument_management.html (last visited on January 20, 2009) (emphasis added).[1]

Under the Transportation and Access provisions, the Plan also provided:

**Road Restoration Strategy**

**TRAN-17** The BLM's strategy for restoring routes that will no longer be available for public or administrative motorized use in the Monument will be phased over a period of years. This will be accomplished as rapidly as funding permits. It is anticipated that this could take as many as ten years. Each year, a percentage of the Monument's base budget will be used to restore routes in areas that are easily accessible to the public and that involve sensitive resources in immediate danger of being degraded. Generally, routes in the Frontcountry and Passage Zones will be closed first. However, there may be routes in the Outback and Primitive Zones that will be considered on a case-by-case basis.

The proposal for restoration will include:
• not repairing washed out routes
• natural barriers, such as large boulders
• dead and down wood to obscure route entry ways
• fences
• ripping up the route bed and reseeding with vegetation natural to that area

---

[1] We note that the appendix does not include a complete copy of the Plan.

• replacing gates with a fence if area has a fence in place
• visitor education and information

Each route will be looked at individually, and the best, least intrusive method will be used based on the geography, topography, soils, hydrology, and vegetation. The first several hundred feet of select routes identified for closure could be left open to provide pull-out areas or camping opportunities, preventing new ground disturbance elsewhere.

Id. at 48.

The Plan also addressed the diversion of water to locations outside of the

Monument:

**Water**

* * *

**WAT-1** *Ensure that land management policies protect water resources.*
Since much of the water important to the Monument falls as precipitation within the Monument, its continued availability can be ensured by appropriate land management policies within the Monument. The BLM will exercise its existing land management authorities to protect and maintain all available water and natural flows in the Monument. Several decisions described in other sections of this Plan are designed to meet this objective. These include the following:

* * *

• In general, diversions of water out of the Monument will not be permitted. There is an existing small-scale diversion of groundwater out of the Monument for the domestic water supply of the nearby town of Henrieville. This Plan does not prohibit the continuation of this diversion, nor its expansion, if necessary, to meet the municipal needs of population growth in Henrieville. Any proposed new groundwater diversion to meet Henrieville's municipal needs could be approved, consistent with the Plan, if the BLM and the Utah State

8

Engineer complete a joint analysis to determine that such development would not adversely impact springs or other water resources within the Monument, and the BLM completes the usual NEPA analysis. Exceptions could be considered for other local community culinary needs if the applicant could demonstrate that the diversion of water will not damage water resources within the Monument or conflict with the objectives of this Plan.

Id. at 31-32 (italics in original).

*The filing and dismissal of plaintiffs' complaint*

On November 14, 2005, a group of entities consisting of Kane County, Utah, the Kane County Board of Commissioners, the Kane County Water Conservancy District (the District), Garfield County, Utah, and the Garfield County Board of Commissioners filed this action against the Secretary, the Department of the Interior, the BLM and its Director, the acting Utah State Director of the BLM, and the Manager of the Monument, seeking mandamus, declaratory and injunctive relief. In their first amended complaint, the plaintiffs alleged that Kane and Garfield Counties "own[ed] . . . numerous R.S. 2477 rights-of-way crossing public lands within the Counties and also within the Monument" "that continue[d] to serve the valuable interests of the public in traveling from place to place across public lands within and without [the] Counties," App. at 15, and that the Counties were authorized under Utah state law to regulate the use of the roads on, and traffic across, those rights-of-way, id. at 16. The first amended complaint further alleged that the District "own[ed] various water rights and rights to water within Kane County," id. at 17, "some of which ha[d] points of

9

diversion within the boundaries of the Monument," id. at 18. In turn, the first amended complaint alleged that the Plan "fail[ed] to comply with" the FLPMA "in that it [wa]s not subject to valid existing rights, it restrict[ed] the use of, and terminate[d], valid existing rights, it extensively and unnecessarily curtail[ed] historic and current public uses, it utterly fail[ed] to address Plaintiffs' local plans, and it ignore[d] FLPMA's principles of multiple use." Id. at 24-25. More specifically, the first amended complaint alleged that the Plan and/or its implementation:

• "created a transportation system in willful blindness to [the] Counties' prior-existing rights, purported to regulate and restrict the use of valid existing rights, and to otherwise close and destroy valid existing rights within the boundaries of the Monument," id. at 25;

• "fail[ed] to identify even a single county right-of-way within the entire 1.8 million acre Monument," id.;

• "denied and impaired [the] Counties' ability to manage their rights-of-way, the public's historic uses and rights, and the county roads that traverse these rights-of-way in accordance with applicable law," id. at 25-26;

• "denied [the] Counties, and the public, the use and enjoyment of the Counties' rights-of-way within the Monument, including according to historic and current public uses," id. at 26; and

• "purport[ed] to trap the District's water rights and points of diversion within the Monument, and to impose unauthorized burdens upon the District to seek diversion of these water rights from the Monument," id. at 27.

Based upon these allegations, the first amended complaint asserted three causes of action against defendants: (1) a claim under the Administrative

10

Procedures Act (APA) and/or "the doctrine of non-statutory judicial review," id. at 28, seeking a declaration that defendants' actions had violated the FLPMA and/or the Due Process Clause and impaired the Counties' "interests in the continuing use, access, possession, maintenance and management of their rights-of-way," id. at 29; (2) a claim for injunctive relief in the form of "an order . . . enjoining enforcement of [certain] Transportation and Access, including Map 2, LAND-4, and Water sections of the Plan," id. at 30; and (3) a claim for mandamus relief in the form of a court order "directing each of the Individual Defendants to first determine Plaintiffs' valid existing rights before asserting or taking any action in enforcement or implementation of [certain] Transportation and Access, including Map 2, LAND-4, or Water sections of the Plan," and "directing Monument manager David Hunsaker to remove any physical barriers placed upon any right-of-way or road within the Monument until such time as it has been determined that such actions will not impair valid existing rights," id. at 31.

On November 23, 2005, the Southern Utah Wilderness Alliance, the National Trust for Historic Preservation, The Wilderness Society, and the Sierra Club (collectively SUWA) moved to intervene as defendants in the action pursuant to Fed. R. Civ. P. 24(a)(2). The district court granted SUWA's motion on January 5, 2006.

On May 5, 2006, the federal defendants moved to dismiss the first amended

complaint on four grounds: (1) "because Plaintiffs' vague and conclusory assertions of injuries to unspecified rights-of-way and water rights [we]re insufficient to establish a concrete, injury-in-fact giving rise to standing," id. at 53; (2) "because Plaintiffs' challenges to the Plan [we]re not ripe due to Plaintiffs' failure to allege how the Plan ha[d], in fact, restricted or denied on a site-specific level the exercise of any valid existing rights held by Plaintiffs," id. at 54; (3) "because the APA does not waive sovereign immunity for the adjudication of claims that are premised upon the assertion of unproven property interests in federal land, such as Plaintiffs' right-of-way and water right claims," id.; and (4) "because neither FLPMA nor the Due Process Clause require[d] the Federal Defendants to identify and determine all existing rights-of-way within a planning area when preparing a land use plan," id.

On May 25, 2006, SUWA moved for judgment on the pleadings, arguing, in pertinent part, that "the United States [could] not be sued based upon bare allegations of title, such as made by the Counties here, except under the Quiet Title Act, 28 U.S.C. § 2409a, which the Counties failed to invoke." Id. at 111.

On June 29, 2007, the district court issued a memorandum opinion and order granting in part the federal defendants' motion to dismiss and SUWA's motion for judgment on the pleadings. In doing so, the district court dismissed the claim for judicial review of the Plan under the APA, but granted the plaintiffs leave to file an amended complaint under the Quiet Title Act "as to the existence

12

and scope of R.S. 2477 rights-of-way . . . ." Id. at 446. As for the "District's claim concerning the diversion of water out of the Monument," the district court dismissed it "as premature," but granted the District "leave to file an amended complaint within twenty (20) days . . . ." Id.

*The District's supplement to the first amended complaint*

On July 16, 2007, the District filed a supplement to the first amended complaint. The supplement alleged that "on June 5, 2006 . . . , the District filed its Application for Transportation and Utility Systems and Facilities on Federal Lands . . . for the purpose of obtaining a right-of-way for the use of a well-pad and to install a 12" to 14" buried pipeline and related utility lines along an existing road." Id. at 450-51. The supplement further alleged that "[t]he Monument manager[]" responded to the Application by citing the Plan provisions regarding diversions of water and stating that a right-of-way "could probably be issued," id. at 453, if the District was able to demonstrate "that the diversion of water w[ould] not damage water resources within the Monument or conflict with the objectives of th[e] Plan," id. at 452. The supplement alleged that "[d]efendants ha[d] no right or authority to determine underground water resource damage, water conflicts, or to prohibit types of uses of the District's water" because "[t]hose decisions [we]re within the exclusive jurisdiction of the Utah State Engineer." Id. at 453. In addition, the supplement alleged that "[d]efendants ha[d] no process or authority for adjudicating water resource

13

damage or conflicts, nor any such process or authority for the 'criteria' that [we]re . . . being imposed upon the District" by the Monument manager and his staff. Id. at 454. Ultimately, the supplement alleged that "[d]efendants' refusal to process the District's Application . . . constitute[d] [either] discrete, final agency action that [wa]s arbitrary, capricious and beyond statutory right and authority," id., or "agency action unlawfully withheld or unreasonably delayed," id. at 455. In turn, the supplement asked the district court to "enter an order declaring the water resource based restrictions or criteria on diversion of water from the Monument in the Plan's LAND-4 and WAT-2 sections to be arbitrary, capricious, or beyond right or authority," "enjoining enforcement of the unlawful water resource based restrictions or criteria in the Plan's LAND-4 and WAT-2 sections," and "directing defendants to process the District's application without reference to the unlawful restrictions or criteria . . . ." Id.

On August 2, 2007, the federal defendants moved to dismiss the first amended complaint as supplemented by the District. The motion argued that the supplement "should be dismissed as unripe and for lack of subject matter jurisdiction because the Plan d[id] not prohibit new water diversions within the Monument and the District otherwise c[ould not] establish that the BLM ha[d] denied or unreasonably delayed the processing of the [District's] Application." Id. at 487. In the memorandum in support of the motion, the federal defendants acknowledged that the District had filed its Application on June 5, 2006. The

14

federal defendants alleged, however, that the Monument manager notified the District on June 26, 2006, "that additional information and documentation [including a location map] needed to be submitted before the Application could be processed." Id. at 495. The Monument manager allegedly further advised the District that (a) the processing time would vary depending upon whether the District or the BLM prepared the environmental assessment (EA), (b) there were no restrictions in the Plan that would preclude issuance of the right-of-way (assuming the District could establish that the diversion of water would not damage water resources within the Monument or conflict with the objectives of the Plan), and (c) it would be premature to offer any opinion on the likelihood that the Application would be approved. Id. at 496. According to the federal defendants, the District subsequently completed its Application and the Monument Manager, on July 31, 2007, sent a letter to the District advising it "that upon payment of the required processing fee, the BLM w[ould] begin processing the Application and preparing an [EA] to analyze the action . . . ." Id. at 498. Based upon these allegations, the federal defendants' motion argued that the District's challenges to the water provisions of the Plan were unripe and should be dismissed for lack of subject matter jurisdiction.

On August 24, 2007, SUWA filed a motion for judgment on the pleadings arguing that, "for the reasons set forth in the" federal defendants' motion to dismiss, the District's supplemental complaint should "be dismissed for lack of

15

ripeness and failure to state a claim upon which relief c[ould] be granted." Id. at 550.

On December 19, 2007, the district court issued an order granting the federal defendants' motion to dismiss and SUWA's motion for judgment on the pleadings. Id. at 711. In doing so, the district court opined "that the District's claims [we]re still premature" because its "Application [wa]s still pending before the BLM," id. at 713, and "the Utah State Engineer ha[d] not taken any final action on a separate water right change application filed by the District with the State Engineer in August, 2007," id. at 714. In short, the district court noted that "not much ha[d] changed since the Court issued its Memorandum Opinion, and the District's challenges to the water provisions of the Plan remain[ed] unripe and premature pursuant to the terms of the Court's prior ruling." Id.

The District has since filed a timely notice of appeal from the district court's June 29, 2007, and December 19, 2007, orders.

*The County plaintiffs' appeal*

On July 31, 2007, the County plaintiffs (all of the plaintiffs except for the District) filed a motion asking the district court to certify, pursuant to Fed. R. Civ. P. 54(b), "its Memorandum Opinion and Order dated June 29, 2007 as a final order." Id. at 472. On September 27, 2007, before any action was taken on their Rule 54(b) motion, the County plaintiffs filed a notice of appeal from the district court's memorandum opinion and order entered on June 29, 2007, dismissing their

16

claims. Shortly thereafter, the district court issued a memorandum opinion and order granting the County plaintiffs' Rule 54(b) motion.[2] Id. at 683.

*Consolidation of appeals*

On February 4, 2008, we issued an order consolidating the two appeals "for purposes of record creation, briefing, and court consideration." Id. at 718.

II

**Appeal No. 07-4207**

The County plaintiffs, in Appeal No. 07-4207, contend the district court erred in granting the federal defendants' motion to dismiss and SUWA's motion for judgment on the pleadings. "We review a district court's dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) de novo." Tsosie v. United States, 452 F.3d 1161, 1163 (10th Cir. 2006). "A district court's dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is also reviewed de novo." Id.

*1) Did the district court's summary dismissal violate* Olenhouse*?*

The County plaintiffs first assert that the district court's summary dismissal of their claims, i.e., dismissing based solely on review of the first amended complaint and motions, and without benefit of the administrative record, violated

---

[2] On October 12 and 15, 2007, SUWA and the Federal Defendants filed motions to dismiss the County plaintiffs' appeal for lack of jurisdiction. In light of the district court's order granting the County plaintiffs' Rule 54(b) motion, we conclude the motions to dismiss are moot.

the procedures required by our decision in Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994). According to the County plaintiffs, the allegations of their first amended complaint established that they had both constitutional and prudential standing to challenge the BLM's Plan, and thus the district court was prohibited from summarily dismissing their complaint, and was instead required to obtain the administrative record and review on the merits the challenged agency action.

We readily reject the County plaintiffs' arguments. It is true that in Olenhouse we outlined the principles of judicial review of final agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 706. See 42 F.3d at 1573-74. Importantly, however, nothing in Olenhouse (or, for that matter, other controlling case law or the APA itself) precludes an APA-based complaint from being summarily dismissed pursuant to Federal Rule of Civil Procedure 12(b). Indeed, Olenhouse is silent with respect to the propriety of motions to dismiss APA-based claims.[3] Olenhouse aside, case law firmly establishes that APA-based claims can, if appropriate, be summarily dismissed. E.g., Benzman v. Whitman, 523 F.3d 119, 132 (2d Cir. 2008) (concluding that district court "properly rejected the sufficiency of all aspects of the Plaintiffs' non-constitutional APA claims").

---

[3] Olenhouse prohibited only a district court's "reliance on arguments, documents and other evidence outside the administrative record," as well as, relatedly, the treatment of an APA-based claim "as a separate and independent action, initiated by a complaint and subjected to discovery and a 'pretrial' motions practice." 42 F.3d at 1579.

18

We thus conclude, contrary to the County plaintiffs' arguments, that the district court did not err by dismissing the complaint pursuant to Rule 12(b) and without obtaining or reviewing the administrative record.

*2) Did the district court properly dismiss the County plaintiffs' claims?*

The County plaintiffs assert a host of challenges to the merits of the district court's order dismissing their claims. Chief among those is their contention that the federal defendants have a duty, prior to closing or managing any roads on purported R.S. 2477 rights-of-way, to conduct administrative determinations regarding the validity of those purported rights-of-way. Id. at 38. "These determinations," the County plaintiffs argue, "are necessary for the Federal Defendants to comply with their FLPMA duty to manage public lands 'subject to valid existing rights' and without diminishing or reducing any right-of-way granted prior to 1976." Id. at 38-39. We disagree.

Prior to 1994, "the BLM staunchly maintained that it lacked authority to make binding decisions on R.S. 2477 rights of way." S. Utah, 425 F.3d at 754. "In 1994," however, "the BLM changed course and proposed comprehensive regulations governing R.S. 2477 rights of way," including "an administrative procedure by which the BLM would adjudicate the validity of R.S. 2477 claims." Id. at 756. "Congress responded with an appropriations provision prohibiting the Department of the Interior from issuing final rules governing R.S. 2477 . . . ." Id. "The General Accounting Office has [since] concluded that this provision has the

19

status of permanent law." Id. (citing GAO Opinion B0277719 at 1-5 (Aug. 20, 1997)). Consequently, we have held "that the BLM lacks primary jurisdiction" to conclusively adjudicate R.S. 2477 claims (such as those now asserted by the County plaintiffs). Id. at 757.

In light of this background, we readily conclude that the County plaintiffs' allegations failed to state a claim upon which relief could be granted under the APA. Section 706(1) of the APA empowers a district court to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). In Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004), the Supreme Court held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." Here, as noted, we have expressly held, in recognition of binding federal law, that the BLM lacks the authority to conclusively resolve R.S. 2477 claims. S. Utah, 425 F.3d at 757. Thus, the County plaintiffs are not entitled under the APA to an order directing the BLM to resolve all outstanding R.S. 2477 claims as part of its Plan.

In their appellate brief, the County plaintiffs attempt to disclaim any interest in having the BLM conclusively "adjudicate ownership" of the purported R.S. 2477 rights-of-way. Aplt. Br. at 42. According to the County plaintiffs, all they are seeking instead is an order directing the BLM to "consider," for its own planning purposes, whether or not the County plaintiffs' purported R.S. 2477

20

rights-of-way are valid. Id. at 41. More specifically, the County plaintiffs allege that the BLM has a duty to administratively adjudicate, by relying at least in part on "preliminary determin[ations]" it made "during its prior [pre-Plan and pre-S. Utah] transportation planning, any and all R.S. 2477 claims the County plaintiffs may have. Id. at 45. In our view, however, neither the statute, 43 U.S.C. § 1701 note (providing that "all actions by the Secretary concerned under this Act shall be subject to valid existing rights"), nor the regulation, 43 C.F.R. § 2801.4 (2000)[4], the County plaintiffs cite to imposes such a requirement. Further, although plaintiffs also cite to a handful of decisions issued by the Interior Board of Land Appeals, Aplt. Br. at 39-41, none of those decisions impose any type of binding requirement on the BLM that would be enforceable under the APA.

To be sure, we recognized in S. Utah that the BLM possessed the authority to "determin[e] the validity of R.S. 2477 rights of way for its own purposes." 425 F.3d at 757. But, importantly, nothing in federal law requires the BLM to do so. Thus, even though the County plaintiffs might prefer that the BLM informally

---

[4] This regulation, entitled "Right-of-way issued on or before October 21, 1976," provided:

    A right-of-way issued on or before October 21, 1976 [the date Congress repealed R.S. 2477], pursuant to then existing statutory authority [R.S. 2477] is covered by the provisions of this part unless administration under this part diminishes or reduces any rights conferred by the grant or the statute under which it was issued, in which event the provisions of the grant or the then existing statute shall apply.

43 C.F.R. § 2801.4 (2000).

adjudicate their purported rights-of-way[5], they may not, as the district court correctly concluded, "shift their burden as R.S. 2477 claimants or shortcut the existing processes for determining their unresolved R.S. 2477 claims by insisting that the BLM import its [internal and] preliminary road inventory work on unresolved R.S. 2477 claims in 1991 and 1993 [prior to this court's decision in S. Utah] into its planning processes in formulating the 1999 Management Plan." App. at 441.

Lastly, the County plaintiffs contend that the district court had subject matter jurisdiction to review what they refer to as their "due process claims under the APA." Aplt. Br. at 43. In support of this contention, the County plaintiffs again refer to the so-called "long-standing procedural requirement that the Federal Defendants consider valid existing rights during planning . . . ." Id. at 44. As explained above, however, we are aware of no provision of federal law that imposes such a procedural requirement.

In connection with this contention, the County plaintiffs also cite, in passing, to the FLPMA's directive that "[l]and use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act." 43 U.S.C. §

_____

[5] We note that the County plaintiffs' complaint did not identify, with specificity, any alleged R.S. 2477 rights-of-way, nor did it identify or challenge any particular road closures that may have occurred simultaneously with, or subsequent to, the Plan's issuance.

22

1712(c)(9). But this directive does not help the County plaintiffs. To begin with, it gives the Secretary of the Interior discretion to determine the extent to which the agency's land use plans are consistent with State and local plans. In light of this discretion, it is doubtful that the provision was intended to, or could reasonably be construed as, creating a "procedural right" enforceable by state or local governmental entities. In any event, even assuming that the provision did create some type of "procedural right," that right was protected in this case because the Plan expressly recognizes that the County plaintiffs may have valid R.S. 2477 rights-of-way and acknowledges that any such rights-of-way will be honored by the BLM.

*3) Does the Quiet Title Act preclude the relief requested by the County plaintiffs?*

The County plaintiffs contend that the Quiet Title Act, which they concede is the exclusive means for adverse claimants to challenge the federal government's title to real property, does not preclude their claims because they are "not request[ing] an adjudication of title" to the purported R.S. 2477 rights-of-way, but rather are "seek[ing] declaratory and injunctive relief requiring the Federal Defendants to comply with statutory procedures and duties before taking agency action." Aplt. Br. at 49.

Although it is true that nothing in the Quiet Title Act necessarily precludes

23

the type of relief the County plaintiffs now assert they are seeking[6], that does not change the fact that they have failed to point to any provision of federal law that would require the BLM to perform the actions they are seeking (i.e., the non-binding administrative determination of their purported rights-of-way). In other words, Quiet Title Act aside, the County plaintiffs' APA-based claims lack merit.

*4) The County plaintiffs' other claims*

In the proceedings below, the County plaintiffs also complained that (a) the Plan's restrictions on "off-highway vehicles" (OHV's) infringed on their purported R.S. 2477 rights-of-way, and (b) the BLM failed to coordinate its formulation of the Plan with county officials and existing county plans for the purported rights-of-way. The district court, in its June 29, 2007 memorandum opinion and order, dismissed both claims. With respect to the OHV-related claim, the district court concluded that it "necessarily implicate[d] questions of title, viz., the existence and historical scope of the Counties' claimed R.S. 2477 rights-of-way within the Monument's boundaries." App. at 443. Because "[t]he Counties ha[d] not pleaded their existing OHV claims under the Quiet Title Act," the district court concluded, "they must be dismissed for want of jurisdiction." Id. As for the "failure to coordinate" claim, the district court concluded that "the alleged injury-in-fact flowing from the BLM's alleged failure to coordinate the

---

[6] In our view, the County plaintiffs failed to clarify in their district court pleadings that they were seeking only an informal, non-binding administrative determination of their purported rights-of-way.

formulation of the Management Plan with county officials and existing county plans appear[ed] to be indistinguishable from that alleged with respect to the Plan's restriction of off-highway vehicles or the status of the Counties' unresolved R.S. 2477 claims within the Monument," and thus "[t]hese allegations . . . [could not] confer standing upon the Counties or jurisdiction upon th[e] Court where the same has already been found to be lacking." Id.

In their appellate brief, the County plaintiffs do not specifically address either of these claims and thus have presumably waived those claims. Even assuming otherwise, we find the district court's analysis persuasive.

### Appeal No. 08-4014

The District, in Appeal No. 08-4014, contends that the Plan's water resource "exception criteria" are unlawful and have impaired the District's water rights. According to the District, "[t]he Utah State Engineer has exclusive jurisdiction to decide water resource damage or conflicts," and "[t]he District's water right" in the Monument "is an appropriated water right, the uses of which are exclusively governed by the Utah State Engineer." Aplt. Br. at 54. The District contends that it "seeks judicial review of the agency decisionmaking culminating in the Federal Defendants' decision to keep third-parties' water in the Monument, and to assume management of water resources." Id. at 55. The District also contends that "[t]he 'exception criteria' are being enforced upon [its] water rights to its detriment . . . and there is no further refinement of the agency's

25

position to warrant delaying review." Id.

The problem with the District's claim, as the district court aptly concluded, is that it fails to allege "an actual injury-in-fact resulting from the challenged [Plan] provisions." App. at 445. The Plan provisions addressing the diversion of water to locations outside of the Monument expressly acknowledged the District's existing water rights: "There is an existing small-scale diversion of groundwater out of the Monument for the domestic water supply of the nearby town of Henrieville. This Plan does not prohibit the continuation of this diversion, nor its expansion, if necessary, to meet the municipal needs of population growth in Henrieville." Plan at 32. These provisions, which the District all but ignores, clearly protect and preserve the District's existing water rights. Thus, we conclude the District lacks standing to challenge these Plan provisions. See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 128 S. Ct. 2531, 2535 (2008) ("[I]n order to have Article III standing, a plaintiff must adequately establish . . . an injury in fact").

That leaves, at best, only the District's interests in expanding its use of water from within the Monument. As to that issue, the Plan stated: "Any proposed new groundwater diversion to meet Henrieville's municipal needs could be approved, consistent with the Plan, if the BLM and the Utah State Engineer complete a joint analysis to determine that such development would not adversely impact springs or other water resources within the Monument, and the BLM

26

completes the usual NEPA analysis." Id. Apparently acknowledging the validity of this provision, the District, on June 5, 2006 (nearly seven months after this action was initiated), "submitted an application [to the BLM] for a [FLPMA] Title V right-of-way to drill a 12-inch well and to construct an access road, pipeline and electrical service line to convey water from the well to the District's Johnson Canyon Water system."[7] App. at 271 (affidavit of Michael Noel). Because the District's Application remains pending before the BLM, any potential claim arising out of the BLM's final decision is premature. See Ohio Forestry Assoc., Inc. v. Sierra Club, 523 U.S. 726, 732 (1998) (noting that the ripeness requirement is designed to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging party). In other words, it is entirely possible that the BLM will grant the District's Application, in which event the District will have suffered no injury.

The judgment of the district court is AFFIRMED. The appellees' motions to dismiss in Appeal No. 07-4207 are DENIED as moot.

---

[7] The District concedes in its opening appellate brief that "FLPMA Title VI governs the terms and conditions for obtaining rights-of-way for water facilities crossing public lands, including lands within the Monument." Aplt. Br. at 22-23.

07-4207, 08-4014 *Kane County v. BLM*

**HENRY**, Chief Judge, concurring.

I concur in my colleagues' fine opinion, but write separately to remind the Counties and the BLM of another avenue that is open to them.

I agree with the majority that the Counties have failed to allege a concrete and particularized injury stemming from BLM's adoption of the Management Plan. In their complaint, the Counties have not identified any specific rights-of-way they contend have been infringed by the Plan. The district court, which we affirm, held that "[a] road closure affecting a specific route claimed to be an R.S. 2477 right-of-way invites a protest, an administrative appeal, or the commencement of a civil action." Dist. Ct. Op. at 21. Nothing in today's opinion precludes such a particularized challenge.

In a challenge such as the one the Counties launched here, depending on the procedural context, entities claiming infringement of their established rights-of-way may be entitled to invoke the protections of the Federal Land Policy Management Act of 1976 (FLPMA), which provides that "all actions by the Secretary concerned under this Act shall be subject to valid existing rights." Pub. L. No. 94-579, § 701(h), 90 Stat. 2743, 2787, *reprinted in* 43 U.S.C.A. § 1701 historical note ("Savings Provisions"). The federal agency is not entitled, under the FLPMA and the Administrative Procedures Act (APA), to close existing county roads asserted to be R.S. 2477 rights-of-way without a reasoned and nonarbitrary basis for doing so, such as an administrative determination, based on

substantial evidence, that the asserted right-of-way is invalid or that the claim exceeds the scope of an acknowledged right-of-way. *See SUWA v. BLM*, 425 F.3d 735, 757 & n.12 (10th Cir. 2005) (noting that administrative determinations regarding R.S. 2477 claims are used for "land-use planning purposes" and citing as an example a Department of Interior decision requiring an administrative determination in advance of closing a road claimed to be an R.S. 2477 right-of-way).

Specifically, we encouraged and outlined an interactive process that is required to put matters at issue:

> [W]hen the holder of an R.S. 2477 right of way across federal land proposes to undertake any improvements in the road along its right of way, beyond mere maintenance, it *must advise the federal land management agency of that work in advance,* affording the agency a fair opportunity to carry out its own duties to determine whether the proposed improvement is reasonable and necessary in light of the traditional uses of the rights of way as of October 21, 1976, to study potential effects, and if appropriate, to formulate alternatives that serve to protect the lands. The initial determination of whether the construction work falls within the scope of an established right of way *is to be made by the federal land management agency,* which has an obligation to render its decision in a timely and expeditious manner. The agency may not use its authority, either by delay or by unreasonable disapproval, to impair the rights of the holder of the R.S. 2477 right of way. In the event of disagreement, the parties may resort to the courts.

*Id.* at 748 (footnotes omitted) (emphasis supplied).

As noted, these administrative determinations are not binding, and may be challenged in court on a de novo basis. *Id.* at 757-58. Such a determination, though not final or binding, is the first step in what this court called the system of "coordination" and "mutual accommodation" required of the holder of an

2

easement and the owner of a servient estate. *Id.* at 746-48. It is inconsistent with this system for one party–whether it is the County or the BLM–to make unilateral changes in the status quo without first considering the legitimate interests of the other. *See id.* at 749 ("'Bulldoze first, talk later' is not a recipe for constructive intergovernmental relations or intelligent land management."). This necessarily requires the parties to make a reasoned determination regarding the existence and scope of the claimed easement, and the "reasonableness and necessity" of any changes, *id.* at 746-47, subject to judicial review in accordance with the APA and other law.

If the agency concludes that no valid right-of-way exists or that the County's assertion of rights exceeds the scope of any easement, it may be necessary for the federal agency to bring a trespass action or the County to bring a claim under the Quiet Title Act. The APA requires only that the agency act in a manner that is not arbitrary and capricious—such as disregarding undisputed rights-of-way or infringing asserted rights-of-way without a reasoned basis for doing so. It does not afford the claimant an opportunity for ultimate resolution of a genuinely disputed property claim against the United States. That is the province of the Quiet Title Act. If the parties follow the procedures entailed by Utah property law and explained by this court in *SUWA*, in a "spirit of mutual accommodation," Restatement (Third) of Property: Servitudes, § 4.10 cmt. a (1998), *quoted in SUWA*, 425 F.3d at 748, we suspect that many disputes will be

3

resolved informally and amicably, as they have been for decades.

At oral argument, we delved into whether or not the *SUWA* process" was a precondition to litigation, and whether the parties have "tried to work it out."  The Counties responded that they had tried, and that "letters have been written and there's no response [from BLM]."  Similarly, BLM read the *SUWA* opinion to instruct "that the parties ought to consult and try and work it out before coming to court."  BLM's view at oral argument was that it has "tried to do that."

In its brief, however, BLM maintained that, because of the vague and undeveloped nature of the Counties' claims, we should "requir[e them] to either follow the process described in *SUWA v. BLM*, 425 F.3d at 746, or bring quiet title actions."  Aple's Br. at 16-17.  Either option "would permit further factual development necessary for the proper resolution of R.S. 2477 issues."  *Id.* at 17.  I find BLM's stance at oral argument difficult to square with BLM's brief.  In any event, it seems to me that the parties have not complied with the spirit of the interactive process outlined in *SUWA*.

Both parties need to utilize the "system of coordination" we described there, *SUWA*, 425 F.3d at 746, via "consultation, communication, and cooperation . . . with [the] . . . counties."[1]  *See* March 22, 2006 Memorandum from the Secretary of the Department of the Interior, at 5 (quoting in part *SUWA*, 425 F.3d

---

[1] This process is based on Utah law.  *See SUWA*, 425 F.3d at 748 (citing Utah Code Ann. § 72-5-303 and the Restatement (Third) of Property: Servitudes, § 4.10 cmt. a (1998)).

at 748).

The American West is a looming space, and the history of its pioneers' tangled relationship with Washington bureaucrats, and the resulting animosity, still looms large. The historian Bernard DeVoto summed up the traditional Western attitude toward the federal government as "[G]et out and give us more money." *See* Bernard DeVoto, *The West Against Itself*, 194 Harper's Magazine 1-13 at 8 (January 1947). Devoto's *bon mot* should not be misunderstood: it recognized merits and equities on both sides. As litigation is expensive and times are hard, *SUWA*'s practical advice should be heeded; additionally, if it is not heeded, an action might not be ripe for adjudication.

Thus, while the Counties are not entitled to challenge the Management Plan on the basis of the generalized claims they set forth in this complaint, by raising specific cases under *SUWA*'s rubric, they have ample opportunities to obtain reasoned consideration of any particularized claim they may have that road closures and restrictions in the Monument violate FLPMA's guarantee of valid existing rights.

5