PUBLIC LANDS FOR THE PEOPLE,
INC., et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT
OF AGRICULTURE, et al.,
Defendants.

No. CIV. S–09–1750 LKK/JFM.

United States District Court,
E.D. California.

Aug. 5, 2010.

David Young, Law Offices of David Young, Los Angeles, CA, for Plaintiffs.

Jason Alan Hill, Govt., Washington, DC, Thomas K. Snodgrass, Govt, United States Department of Justice, Denver, CO, Lisa Tamara Belenky, San Francisco, CA, for Defendants.

*ORDER*

LAWRENCE K. KARLTON, Senior District Judge.

In 2008, the United States Forest Service adopted a "Travel Management Plan" for the Eldorado National Forest ("2008 Plan" and "ENF"). This plan limits motorized vehicle use of Forest Service roads and generally prohibits cross-country motorized travel.

Plaintiffs are miners. They challenge the 2008 Plan under twenty causes of action, most of which invoke several theories of liability. Broadly speaking, plaintiffs argue that the plan interferes with access to mining claims in the ENF. Defendants are the United States Department of Agriculture, its subsidiary the United States Forest Service, and four federal officials.[1]

Defendants move for a more definite statement as to plaintiffs' first claim, which alleges that defendants violated the National Environmental Policy Act. Defendants separately move to dismiss claims II through XVIII and XX. Defendants do not challenge claim XIX, which is a blanket request for injunctive relief, and plaintiffs do not oppose dismissal of claim XV. For the reasons stated below, the court grants both of defendants' motions.

## I. Background

### A. Plaintiffs

Plaintiff Public Lands for the People is a nonprofit "nationwide organization of miners." Compl. ¶ 40. The eight individual plaintiffs are all members of this organization. Only four plaintiffs are alleged to own mining claims within Eldorado National Forest, although a fifth allegedly "uses" the forest and a sixth allegedly sold a claim on account of the challenged plan. Compl. ¶¶ 41–47. The last two individual plaintiffs allege that they have "expressed interest and desire to prospect and mine in the ENF." Compl. ¶¶ 41–42. More generally, plaintiffs allege that there are three hundred and sixty five valid existing mining estates in the ENF, attributing this figure to the Bureau of Land Management without citation. Compl. ¶ 30. Plaintiff Randy Burleson further alleges that he uses the ENF as an "off-road enthusiast." Compl. ¶ 45.

### B. The 2008 ENF Travel Management Plan

Plaintiffs in this suit challenge the Forest Service's 2008 Travel Management Plan for the ENF. This plan "regulate[s] unmanaged public wheeled motor vehicle use by allowing use on specific National Forest Transportation System (NFTS) roads and trails and prohibiting cross country travel." Record of Decision ("ROD") at 4. The "National Forest Transportation System" does not include State, county, and private roads within the ENF, nor does it include forest service roads "managed for standard four wheel passenger vehicles." Final Environmental Impact Statement ("FEIS") at 2–2, ix; *see also* ROD at 4 (noting that there are 635 miles of such roads in the ENF). Thus, the 2008 Plan does not apply to these roads.

---

1. In a related action, four environmental nonprofit organizations challenge the 2008 Plan from a roughly opposing perspective. *Center for Sierra Nevada Conservation v. United States Forest Service*, 2:09–cv–2523–LKK–JFM (E.D. Cal.). Although the court has ordered these cases related, the two cases have not been consolidated, and neither group of plaintiffs has intervened in the others' case.

The first step in adoption of the 2008 Plan was taken on October 16, 2005. On that date, the Forest Service published a notice of intent to prepare an environmental impact statement in support of a travel management decision for the Eldorado National Forest. *See* FEIS at 1–9. The Forest Service states that it took this step for two reasons.

One reason was that in *Center for Sierra Nevada Conservation v. Berry,* No. 2:02–cv–00325–LKK–JFM (E.D.Cal.) (*"Berry"*) the undersigned ordered the Forest Service to reexamine the issue. *Berry* concerned a challenge to an "Off–Highway Vehicle Plan" for ENF that the Forest Service adopted in 1990. On August 16, 2005, this court ordered the Forest Service to withdraw the 1990 plan and to "issue a Final Environmental Impact Statement and Record of Decision on a new ENF [Off–Highway Vehicle] Plan (or site-specific area plans)."[2]

The second reason was that in 2005 the Forest Service published a general rule requiring the Forest Service to designate a system of roads, trails, and areas for motor vehicle use for all administrative units of the National Forest System in accordance with certain criteria. This rule was published on November 9, 2005, subsequent to publication of the notice of intent for the Eldorado Travel Management Decision. *See* 70 Fed. Reg. 68,264 (Nov. 9, 2005).[3] It is unclear whether the 2005 Rule was influenced or motivated by the *Berry* litigation. Nonetheless, the Forest Service indicates that the notice of intent for the Eldorado Travel Management Decision was published in anticipation of the November rule and that the final ENF decision comports with this rule.

After publication of the October 16, 2005 notice, the Forest Service conducted public meetings and solicited public comments. The Forest Service then published a draft Environmental Impact Statement on July 20, 2007. The draft environmental impact statement ("DEIS") considered five alternatives. The Forest Service ultimately adopted a modification of alternative B for the 2008 Plan, publishing a ROD on March 31, 2008 and a final EIS two days thereafter, on April 2, 2008. This decision allows motor vehicle use on 242 miles of NFS trails and 1,002 miles of "ML–2" roads, which are roads "maintained for high clearance vehicles." FEIS at xviii, ix. Plaintiffs allege that "the closure of roads, rights of way, and haul roads" effectuated by the 2008 Plan "affects over 50% of the total roads and rights of way in the ENF." Compl. ¶ 37.

The parties agree that miners may in some circumstances use motorized vehicles on roads closed to the general public. Under Forest Service regulations, travel management decisions do not restrict "[m]otor vehicle use that is specifically authorized under a written authorization issued under Federal law or regulations." 36 C.F.R. § 212.51(a)(8). The Forest Service contends that miners must secure such authorization by filing a Notice of Intent or Plan of Operations under 36 C.F.R. § 228.4. The EIS itself explained that "[i]n the event that ground disturbing activities or the use of public lands are such to warrant the need for a Plan of Operations, an environmental analysis will

---

**2.** The August 16, 2005 order required that the new plan be adopted by December 31, 2007. On August 24, 2007, the court approved the parties' stipulation continuing this deadline to April 2, 2008. Because of the instant matter's roots in *Berry*, the two cases have been related under E.D. Cal. Local Rule 123.

**3.** The statutory authority invoked for this rule was the Bankhead–Jones Farm Tenant Act, 7 U.S.C. § 1011 and the Wildfire Disaster Recovery Act of 1989, 16 U.S.C. § 551.

be completed[.] This Plan of Operations or other authorization may include the use of specific roads or trails not otherwise open to public wheeled motor vehicle use." FEIS at 3–212.

Plaintiffs contend that the 2008 Plan is flawed insofar as it requires plaintiffs to utilize these procedures. Plaintiffs alternatively argue that the 2008 Plan, interpreted in light of the 2005 Rule, does not require miners to do so, and that the Forest Service's contrary interpretation of its own plan is flawed.

## C. The Notice of Intent/Plan of Operations System

Although the parties disagree as to whether miners must file a notice of intent and/or plan of operations prior to using roads not open to the public, there is no dispute as to what the notice of intent/plan of operations process itself involves. *See Park Lake Resources v. United States Dep't of Agric.*, 197 F.3d 448, 450 (10th Cir.1999) (summarizing these regulations). A notice of intent is the simpler document. The regulation requires a notice of intent for any operations that *"might cause"* significant disturbance of surface resources." 36 C.F.R. § 228.4(a) (emphasis added). "Operations" include the use of "roads and other means of access." 36 C.F.R. § 228.3(a). The Forest Service contends that use of motorized vehicles on roads not designated for such use is by definition activity that "might cause significant disturbance of surface resources" because

such roads would otherwise remain undisturbed. Thus, at a minimum, a miner seeking to use such roads must submit a notice of intent.[4]

"[I]f the proposed operations *will likely cause*" a disturbance of surface resources a more elaborate plan of operations is required. 36 C.F.R. § 228.4(a)(3) (emphasis added). If a miner submits a notice of intent, within 15 days of receipt of the notice of intent the District Ranger will determine whether the proposed activity crosses the "will likely cause" threshold, such that "a proposed plan of operations is required before operations may begin." 36 C.F.R. § 228.4(a)(2). Alternatively, a miner may submit a plan of operations initially. If a plan of operations is submitted under either pathway, operations cannot commence until the Forest Service affirmatively approves the plan. 36 C.F.R. § 228.12.

Approval of a plan of operations is a federal agency action subject to the National Environmental Policy Act. *See* 36 C.F.R. § 228.4(f) ("Upon completion of an environmental analysis in connection with each proposed operating plan, the authorized officer will determine whether an environmental statement is required.... The Forest Service will prepare any environmental statements that may be required."); *Hells Canyon Pres. Council v. Haines*, CV. 05–1057, 2006 WL 2252554, *10, 2006 U.S. Dist. LEXIS 54884, *32 (D.Or.2006) (citing *Cady v. Morton*, 527 F.2d 786, 796 (9th Cir.1975)). Within thir-

---

**4.** In *United States v. Lex*, 300 F.Supp.2d 951, 961 (E.D.Cal.2003) (Karlton, J.), I held that under 36 C.F.R. § 228.4(a)(2) as it read at that time, operations were excluded from the notice of intent requirement when they would not involve "use of mechanized earthmoving equipment [or] ... cutting of trees." While I noted that this rule was curious, I explained that the appropriate remedy was for the Forest Service to amend the regulation. The Forest Service has done so, and the regula-

tion now provides that operations are exempt when they "will not involve the use of mechanized earthmoving equipment, such as bulldozers or backhoes, or the cutting of trees, *unless those operations otherwise might cause a significant disturbance of surface resources."* 36 C.F.R. § 228.4(a)(1)(vi) (emphasis added). *See also, e.g., United States v. Russell*, No. CR 06–0646, 2009 U.S. Dist. LEXIS 1608 (N.D.Cal. Jan. 5, 2009) (Patel, J.) (noting this amendment).

ty days of receipt of a plan of operations, the Forest Service must either approve the plan, explain that no plan is necessary, "[n]otify the operator of any changes in, or additions to, the plan of operations deemed necessary to meet the purpose of the regulations," or inform the operator that additional time is necessary to complete review. 36 C.F.R. § 228.5(a)(1)-(5). In determining whether to approve a plan, the Forest Service must ensure that the plan conforms to state and federal air and water quality statutes. 36 C.F.R. § 228.8(a)-(b). The regulations further impose a variety of other environmental standards, which typically require the operator to take such measures as are "practicable." 36 C.F.R. § 228.8(c)-(g).

## D. Procedural History

Plaintiffs filed suit challenging the 2008 Plan on June 24, 2009. Plaintiffs' complaint is seventy-one pages long, enumerates twenty causes of action, and argues that the 2008 decision violates nineteen state and federal statutes, various regulations, two executive orders, the Fifth and Fourteenth Amendments to the United States Constitution, and Article 1 § 7 of the California Constitution. Moreover, when confronted with ambiguity in the complaint, plaintiffs have in briefing and oral argument embraced each and every possible construction offered by the court and defendants.[5]

Defendants timely filed the instant motion to dismiss and motion to strike on October 2, 2009. These motions are supported by memoranda of lengths commensurate with the complaint. The parties stipulated to an extended briefing schedule and several continuances, after which the court heard the matter on April 19, 2010. Defendants subsequently filed various supplemental exhibits responding to questions raised at the hearing. Plaintiffs objected to these exhibits, and defendants replied to these objections.

## II. Motion to Dismiss

### A. Standards

#### 1. Standard for a Fed.R.Civ.P. 12(b)(1) Challenge to Subject Matter Jurisdiction

The party seeking to invoke the jurisdiction of the federal court has the burden of establishing that jurisdiction exists. *KVOS, Inc. v. Associated Press,* 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183 (1936); *Assoc. of Medical Colleges v. United States,* 217 F.3d 770, 778–79 (9th Cir.2000). On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(1), the standards that must be applied vary according to the nature of the jurisdictional challenge.

If the challenge to jurisdiction is a facial attack, i.e., the defendant contends that the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the existence of jurisdiction, the plaintiff is entitled to safeguards similar to those applicable when a Rule 12(b)(6) motion is made. *See Sea Vessel Inc. v. Reyes,* 23 F.3d 345, 347 (11th Cir. 1994), *Osborn v. United States,* 918 F.2d 724, 729 n. 6 (8th Cir.1990); *see also* 2–12 Moore's Federal Practice—Civil § 12.30 (2009).

If the challenge to jurisdiction is made as a "speaking motion" attacking the truth of the jurisdictional facts alleged by the plaintiff, a different set of standards must be applied. *Thornhill Pub. Co., Inc. v.*

---

**5.** Fed.R.Civ.P. 8 requires that a complaint provide a "short and plain" statement of the grounds for relief. It is hard to imagine that the complaint here is the type contemplated by the Federal Rules. Nonetheless, as the court reiterates several times below, binding authority compels consideration of jurisdictional arguments prior to evaluation of the complaint's compliance with the Federal Rules.

*General Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir.1979). Where the jurisdictional issue is separable from the merits of the case, the district court is free to hear evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where necessary. *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983); *Thornhill*, 594 F.2d at 733. "In such circumstances '[n]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'" *Augustine*, 704 F.2d at 1077 (quoting *Thornhill*, 594 F.2d at 733).

However, where the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant' facts on either a motion going to the merits or at trial.

*Id.* (citing *Thornhill*, 594 F.2d at 733–35 and 5 C. Wright & A. Miller, Federal Practice & Procedure § 1350, at 558 (1969 & Supp.1987)). On a motion going to the merits, the court must employ the standard applicable to a motion for summary judgment. *Farr v. United States*, 990 F.2d 451, 454 n. 1 (9th Cir.1993), *cert. denied*, 510 U.S. 1023, 114 S.Ct. 634, 126 L.Ed.2d 592 (1993).

In this case, defendants' motion is largely of the former type, in that defendants largely do not dispute plaintiffs' factual allegations. On one issue, however, defendants challenge facts. Defendants argue that plaintiffs had notice, both at the time the 2008 Plan was under consideration and at the time the instant suit was filed, of which particular roads would be closed. The court addresses this factual dispute below.

## 2. Standard for a Fed.R.Civ.P. 12(b)(6) Motion to Dismiss

A Fed.R.Civ.P. 12(b)(6) motion challenges a complaint's compliance with the pleading requirements provided by the Federal Rules. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must give defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation and modification omitted).

To meet this requirement, the complaint must be supported by factual allegations. *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). "While legal conclusions can provide the framework of a complaint," neither legal conclusions nor conclusory statements are themselves sufficient, and such statements are not entitled to a presumption of truth. *Id.* at 1949–50. *Iqbal* and *Twombly* therefore prescribe a two step process for evaluation of motions to dismiss. The court first identifies the non-conclusory factual allegations, and the court then determines whether these allegations, taken as true and construed in the light most favorable to the plaintiff, "plausibly give rise to an entitlement to relief." *Id.; Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007).

"Plausibility," as it is used in *Twombly* and *Iqbal*, does not refer to the likelihood that a pleader will succeed in proving the allegations. Instead, it refers to whether the non-conclusory factual allegations, when assumed to be true, "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). A complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988).

■ In evaluating a motion to dismiss, a court may look beyond the complaint itself to judicially noticeable evidence and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1124 (9th Cir.2002). The parties agree that these rules encompass the various official decisions and environmental impact statements at issue here. Despite the general obligation to accept the complaint's allegations as true, the court rejects allegations regarding these documents' contents where the allegations are contradicted by the documents themselves. *See Mullis v. United States Bankr.Ct.,* 828 F.2d 1385, 1388 (9th Cir.1987), *Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.1987).

**B. Preliminaries Regarding Review under Section 706(2) of Administrative Procedure Act**

■ Plaintiffs' claims are largely governed by the Administrative Procedure Act ("APA"). Plaintiffs' tenth claim alleges a violation of the APA itself, arguing that defendants acted arbitrarily and capriciously. A claim that an agency acted arbitrarily and capriciously for purposes of the APA cannot "stand free of any other law." *Or. Natural Resources Council v. Thomas,* 92 F.3d 792, 798 (9th Cir.1996). Instead, the APA provides a mechanism for enforcing obligations arising under other authority. *Id.* In opposing defendants' motion to dismiss, plaintiffs recharacterize their tenth claim as asserting unspecified violations of the National Environmental Policy Act ("NEPA").[6] Because plaintiffs' first claim already seeks to enforce NEPA through the APA, the tenth claim is dismissed as wholly duplicative.

As to the other claims, with the possible exception of plaintiffs' Americans with Disabilities Act claim and plaintiffs' Fifth Amendment Takings claim, all of plaintiffs' federal claims invoke statutes that do not provide separate causes of action. Nor do the claims themselves specify the source of the private cause of action. Defendants characterize these claims as arising under the APA, and plaintiffs do not dispute this characterization, although defendants argue that certain of these claims should have been brought under other statutes. *See Clouser v. Espy,* 42 F.3d 1522, 1528 n. 5 (9th Cir.1994) (claims that agency actions "were taken without statutory authority, or that they violate statutory standards" should be treated as arising under the APA), Compl. ¶ 1 (asserting generally that defendants' conduct is made reviewable

---

**6.** Although ignored by plaintiffs' opposition, count X alleges violation of the APA separate from the claim that the Forest Service was arbitrary and capricious. Paragraph 178 of the complaint alleges that the Forest Service violated the obligation to disclose "either the terms or substance of the proposed rule or a description of the subjects and issues involved" in conjunction with a notice of pro-

posed rulemaking. 5 U.S.C. § 553(b)(3). Plaintiffs' supporting factual allegations, however, allege failure to disclose certain *impacts* potentially at issue in the NEPA analysis, rather than a failure to disclose the terms or substance of the rule itself. Accordingly, assuming that plaintiffs have not abandoned this theory of liability, the court dismisses this remaining aspect of the tenth claim as well.

under the APA), ¶ 2 (invoking APA § 10), and part II(C)(3), below. For these claims, the APA provides statutory limits on reviewability, the governing standard of review, and limits on the available remedies. Notably, plaintiffs are not entitled to monetary damages on these claims. 5 U.S.C. § 702 (waiving sovereign immunity only for claims "seeking relief other than money damages"). Insofar as plaintiffs' twentieth claim, for "damages," is properly brought as a separate claim, this claim must be predicated on plaintiffs' Fifth Amendment takings claim, plaintiffs' ADA claim, and plaintiffs' state law claims.

## C. Subject Matter Jurisdiction

■ Defendants make four jurisdictional arguments under Fed.R.Civ.P. 12(b)(1), each of which challenges many of plaintiffs' claims. Federal courts must address jurisdictional issues before addressing the merits.[7] *See, e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Defendants' jurisdictional arguments concern standing, sovereign immunity, ripeness, and inability to enforce broad statutory directives. Defendants begin with standing, asserting that plaintiffs must offer additional facts to demonstrate standing. Defendants' other arguments potentially identify deeper inadequacies unlikely to be cured by amendment. Accordingly, in hope of avoiding the need to revisit these latter issues in a subsequent pleading, the court addresses defendants' arguments in reverse order. *See Tenet v. Doe*, 544 U.S. 1, 6 n. 4, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005) (when confronted by multiple jurisdictional questions, a court may address these questions in any order.). Roughly stated, defendants argue (1) that the statutory directives invoked by plaintiffs are not judicially enforceable, such that certain claims cannot be brought *at all*, (2) that certain claims are unripe, and cannot be brought *yet*, (3) that for certain claims, the United States has waived sovereign immunity narrowly, requiring claims to be brought *under a different statute*, and (4) that plaintiffs lack standing for many claims, such that plaintiffs must provide additional allegations or evidence demonstrating that *these plaintiffs* have standing.

### 1. Enforceability of Broad Mandates

Defendants argue that claims III, V through VII, XI, and XIV should be dismissed because they "seek to compel implementation of broad programmatic directives rather than 'discrete agency action that [the Forest Service] is required to take.'" Defs.' Reply Br. 13 (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004)) (emphases omitted).[8] Defendants concede that the

---

7. Defendants have not brought a jurisdictional challenge to plaintiffs' tenth claim, which the court dismissed in the preceding section.

8. Defendants' opening memorandum characterized this argument as speaking to the merits under Fed.R.Civ.P. 12(b)(6), whereas defendants' reply memorandum frames this as a jurisdictional issue.

*Norton* was decided on the APA's statutory language rather than constitutional limits, although the analysis shows that the relevant portions of the APA were crafted to navigate underlying separation of powers and justicia-

bility concerns. While *Norton* did not state whether the APA's limits were jurisdictional, it appears that they are. *Siskiyou Reg'l Educ. Project v. United States Forest Serv.*, 565 F.3d 545, 554 (9th Cir.2009) (assuming that *Norton* described a jurisdictional limit), *Ctr. for Biological Diversity v. Veneman*, 394 F.3d 1108, 1113 (9th Cir.2005) (*Norton* describes jurisdictional limits), *but see Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 829 (9th Cir. 2002) (holding that the finality requirement in 5 U.S.C. § 704 is nonjurisdictional, and suggesting that this was generally true of the APA's limits on claims).

2008 Plan represents discrete and final agency action reviewable under the APA. Defendants nonetheless argue that the Plan's alleged deficiencies concern policy mandates that are not judicially enforceable. As the court explains, insofar as *Norton* holds that broad mandates are unenforceable, this holding applies solely to "failure to act" claims under 5 U.S.C. § 706(1) and has no applicability to the claims at issue here, which challenge completed agency action under § 706(2).

*Norton* concerned the Bureau of Land Management's ("BLM") regulation of off-road vehicle use in federal "wilderness study areas." These areas are federal lands that BLM had identified as potential wilderness, but which Congress had not yet decided whether to protect as wilderness. 542 U.S. at 59, 124 S.Ct. 2373. Until Congress reaches a decision, BLM is obliged to manage these areas " 'in a manner so as not to impair the suitability of such areas for preservation as wilderness.' " *Id.* (quoting 43 U.S.C. § 1782(c)). BLM had adopted a "land use plan" (also referred to as a "resource management plan") for the areas at issue in *Norton*, and this plan contained various provisions regarding regulation of off-road vehicle use. *Id.* at 61, 124 S.Ct. 2373.

Plaintiffs in *Norton* brought three claims, only the first of which is relevant here. Plaintiffs argued "that BLM had violated its nonimpairment obligation under § 1782(c) by allowing degradation in certain [wilderness study areas]" under the challenged plan, thereby "fail[ing] to take action with respect to ORV use that [BLM] was required to take." *Id.* at 60–61, 124 S.Ct. 2373. This claim was brought under section 706(1) of the APA, to "compel agency action unlawfully withheld or unreasonably delayed."

The Court held that the statutory obligation to " 'manage [wilderness study ar-eas] ... in a manner so as not to impair the suitability of such areas for preservation as wilderness,' " was "mandatory as to the object to be achieved, but it leaves BLM a great deal of discretion in deciding how to achieve it." *Id.* at 66, 124 S.Ct. 2373 (quoting 43 U.S.C. § 1782(c)). The court explained the limits to enforcement of such a mandate:

The principal purpose of the APA limitations we have discussed—and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. To take just a few examples from federal resources management, a plaintiff might allege that the Secretary had failed to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance," or to "manage the [New Orleans Jazz National] [H]istorical [P]ark in such a manner as will preserve and perpetuate knowledge and understanding of the history of jazz," or to "manage the [Steens Mountain] Cooperative Management and Protection Area for the benefit of present and future generations." 16 USC §§ 1333(a), 410bbb–2(a)(1), 460nnn–12(b). The prospect of pervasive oversight by federal courts over the manner

and pace of agency compliance with such congressional directives is not contemplated by the APA. *Norton,* 542 U.S. at 66–67, 124 S.Ct. 2373. As this court reads *Norton,* it prohibits *"general orders* compelling compliance with broad statutory mandates" and *"pervasive oversight . . .* over the manner and pace of compliance" with broad mandates, but *Norton* did not hold that broad mandates are absolutely unenforceable. Instead, *Norton* recognized concerns raised by judicial enforcement of such mandates and explained that the limits provided by the APA address these concerns.

■ First, only "discrete agency action" may be reviewed under the APA. *Norton,* 542 U.S. at 62, 124 S.Ct. 2373 (citing 5 U.S.C. § 551). Courts may determine whether particular actions violate broad mandates, but the APA does not permit courts to oversee agencies wholesale. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Thus, judicial review under the APA will always be confined to a bounded set of facts.

Second, the terms of sections 706(1) and (2) provide narrow standards of review. Section 706(2), which was not at issue in *Norton,* directs courts to set aside actions that are, *inter alia,* "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Courts ask whether the evidence before the agency at the time a discrete decision was made rationally supports the decision reached by the agency. This deference to the agency permits judicial enforcement of broad mandates without the "pervasive oversight" rejected by *Norton. Norton,* 542 U.S. at 62, 124 S.Ct. 2373. Although *Norton* may be read as suggesting that it is inappropriate for a court to ever "determine whether compliance [with a broad statutory mandate] was achieved," the language surrounding the quoted phrase demonstrates that the

Court was concerned with such determinations only to the extent that they would require excessive intrusion on the agency. 542 U.S. at 66, 124 S.Ct. 2373.

■ Section 706(1), which permits claims for failure to act, does not incorporate the arbitrary or capricious standard. It would be difficult to apply this standard where the agency has neither acted nor decided not to act, because in such cases there will be no administrative record underlying an agency decision. Section 706(1) accommodates this concern by specifying a different standard of review—"unlawfully withheld or unreasonably delayed." *Norton* interpreted this language to apply only to actions the agency is legally require to take. *Norton* at 63, 63 n. 1, 124 S.Ct. 2373. This interpretation effectively precludes enforcement of broad statutory mandates under section 706(1), insofar as a broad mandate typically is not one that requires discrete agency action. This result, however, derives from the particular language of section 706(1), language which does not apply to claims under section 706(2). Moreover, as explained above, the policy concerns underlying this limitation are separately addressed through the standard of review provided by section 706(2).

■ In several related contexts, the Ninth Circuit has distinguished *Norton* on grounds supporting the above analysis, recognizing that *Norton's* interpretation of section 706(1) was inapplicable to claims under section 706(2). *Oregon Natural Desert Ass'n v. BLM,* 531 F.3d 1114, 1140 (9th Cir.2008), *Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.,* 477 F.3d 668, 681 n. 10 (9th Cir.2007). Notably, *Oregon Natural Desert Ass'n* held that a NEPA analysis could be arbitrary and capricious under section 706(2) for failing to analyze specific factors even though the omitted analysis could not separately be compelled

■ § 706(1) as an action that the agency was "required to take." 531 F.3d at 1140. In summary, where a statutory directive does not require action, the statute may be so "broad" that it cannot be enforced under section 706(1) without being too broad to be enforced under section 706(2).

■ There are, of course, certain statutory directives that are so broad that they defy review under the arbitrary and capricious standard as well. The APA exempts from review "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "An agency action is 'committed to [its] discretion by law' where a 'statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion'—i.e., where it is 'drawn in such broad terms that in a given case there is no law to apply.'" *Pac. Northwest Generating Coop. v. Bonneville Power Admin.*, 596 F.3d 1065, 1075 n. 7 (9th Cir.2010) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)). Such statutes are "rare instances," *Heckler*, 470 U.S. at 830, 105 S.Ct. 1649, and this exception is "very narrow." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Defendants have not sought to invoke this exception here—instead, defendants erroneously argue that the only action reviewable under any provision of the APA is action that is legally required. Because the court dismisses the challenged claims on other jurisdictional grounds, the court declines to address § 701(a)(2) *sua sponte*. If plaintiffs file an amended complaint curing the jurisdictional defects identified below, defendants may bring an argument invoking section 701(a)(2).

In this case, plaintiffs challenge a discrete and final agency action—publication of the 2008 ENF Travel Management Plan—under 5 U.S.C. § 706(2). *Norton* presents no barrier to such claims.

### 2. Ripeness

In the context of review of agency action, the ripeness doctrine serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The doctrine is "'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) (quoting *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57, n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993)) (hereinafter "*Nat'l Park Hospitality* ").

■ "In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court . . . must consider: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (hereinafter "*Ohio Forestry* "). Other decisions have combined the second and third factors from the *Ohio Forestry* into a single inquiry, the "fitness of the issues for judicial decision." *See Nat'l Park Hospitality*, 538 U.S. at 808, 123 S.Ct. 2026 (citing *Abbott*

*Labs,* 387 U.S. at 149, 87 S.Ct. 1507).[9] Courts may analyze fitness before considering hardship to the parties. *Park Lake Resources,* 197 F.3d at 450.

Defendants argue that claims II, VI through IX, XI through XIII, XVI, XVII, XVIII, and XX are unripe. Each of these claims relates to limits on miners' vehicle travel. When questioned about the contours of these claims, plaintiffs have eagerly embraced every possible construction of these claims suggested by either defendants or the court. Construing the complaint liberally, the challenged claims allege four theories of injury. Plaintiffs contend that all claims challenged on ripeness grounds argue that(1) the 2008 Plan limits miners' access to mining sites because the Forest Service will refuse to grant exemptions even when miners follow the notice of intent/plan of operations process, (2) even if the Forest Service will grant exceptions, the burdens involved in the notice of intent/plan of operations process are so great as to amount to a *de facto* prohibition on mining, and (3) the Forest Service has no authority to require miners who seek to use roads to comply with the notice of intent/plan of operations process. Beyond these substantive arguments, in opposing defendants' sovereign immunity argument (discussed below), plaintiffs contend that a subset of the challenged claims present a procedural theory of liability, arguing that the Forest Service was required to determine whether the 2008 Plan would affect easements and other rights of way before adopting the plan.[10]

---

**9.** Using of the term "fit" to describe only one aspect of the ripeness inquiry may seem to prejudge the issue, in that common sense suggests that an issue "unfit" for review is "unripe" regardless of hardship. Having noted this terminological oddity, the court uses "fit" in accordance with the caselaw, as describing only one aspect of the ripeness inquiry.

**10.** To clarify, each claim challenged on ripeness grounds alleges, in a shotgun fashion, numerous theories of liability. It appears that each such theory depends on at least one of the above four arguments. For example, Claims II, VI, VII, XI, and XII argue that the 2008 Plan violates statutory prohibitions on interference with mining. Claim VII elaborates on this by further arguing that due process required individualized notice and a hearing prior to such interference. This added theory does not complicate the ripeness analysis, however, because if the question of whether there will be interference is unripe, the question of whether such interference would violate due process is unripe as well.

To summarize the other claims, Claim XIII argues that the 2008 Decision violates the Americans with Disabilities Act by limiting disabled persons' ability to mine. Claims XVI and XVII argue that the Decision violated easements, implied rights of use, or unspecified property rights related to mining claims.

Claim XVIII is a generalized claim for "takings," and claim XX is a general claim for "damages." Finally, claims VIII and IX argue that the 2008 Plan closed public rights of way recognized under Revised Statute 2477, in violation of FLPMA and the Omnibus Act of 1996, Pub. L. No. 104–208, § 108, respectively. R.S. 2477 is described in detail in *Kane County Utah v. Salazar,* 562 F.3d 1077, 1079 (10th Cir.2009). Although R.S. 2477 provides a right of access to the general public, rather than to miners in particular, plaintiffs explicitly predicate their R.S. 2477 claims on miners' rights. *See, e.g.,* Compl. ¶¶ 165, 173.

Although these four theories encompass the challenged claims, for each individual claim it is unclear which theories that claim implicates. Moreover, plaintiffs provide contradictory indication as to whether they intend to proceed under the fourth theory at all. Plaintiffs state, in opposition to dismissal of count XVIII, that plaintiffs "do not allege that the Forest Service has to identify every R.S. 2477 road in the ENF.... Plaintiffs allege that if a road is a R.S. 2477 road, then the Forest Service cannot close it to miners and prospectors, prohibiting them from accessing their mining claims." Opp'n at 27. At oral argument, however, plaintiffs appeared to embrace the fourth theory. For purposes of the present motion, the court assumes that plaintiffs intended to bring all four theories,

■ The ripeness of each of these theories of liability must be considered separately. *See, e.g., Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 56–65, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), *Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1434–36 (9th Cir.1996). As explained below, the latter two theories are ripe, but the first two are not.[11]

### a. Fitness of the Issues for Judicial Decision

Defendants rely on three cases in which courts held that challenges to broad agency decisions would need to await fact-specific applications of the decisions. In *Ohio Forestry,* 523 U.S. at 729, 118 S.Ct. 1665, plaintiffs challenged a Land and Resource Management Plan adopted by the Forest Service. Plaintiffs argued that the plan favored logging and clearcutting in national forests in violation of various statutory duties. The Court explained that

> immediate judicial review directed at the lawfulness of logging and clearcutting [pursuant to the challenged plan] could hinder [the Forest Service's] efforts to refine its policies: (a) through revision of the Plan, e.g., in response to an appropriate proposed site-specific action that is inconsistent with the Plan, or (b) through application of the Plan in practice, e.g., in the form of site-specific proposals, which proposals are subject

to review by a court applying purely legal criteria.

523 U.S. at 735, 118 S.Ct. 1665 (internal citation omitted). Thus, the issue was unfit for review.

In *Nat'l Park Hospitality,* plaintiffs challenged an interpretive rule published by the National Parks Service, which held that contracts with concessioners were outside the scope of the Contract Disputes Act of 1978, 41 U.S.C. § 601 et seq. The Court concluded that "[a]lthough the question presented ... is a purely legal one and [the challenged action] constitutes final agency action within the meaning of § 10 of the APA, 5 USC § 704, ... further factual development would significantly advance our ability to deal with the legal issues presented." *Nat'l Park Hospitality,* 538 U.S. at 812, 123 S.Ct. 2026 (quotation and other citations omitted). The majority based this conclusion on the potential for case-specific refinement of the stated policy. While the government "generally argue[s] that [the National Park Service] was correct to conclude that the [Contract Disputes Act] does not cover concession contracts, [it] acknowledge[s] that certain types of concession contracts might come under the broad language of the [Act]. Similarly, while [the two concessioners] present a facial challenge to [the interpretation], both rely on specific characteristics of certain types of concession

and the court need not determine which theories may be supported by the allegations and arguments included in particular causes of action.

11. Other cases have rejected the third and fourth theories on the merits. As to the third, the Ninth Circuit has held that the Forest Service has authority to require miners to comply with the notice of intent and plan of operations procedures. *See Siskiyou Reg'l Educ. Project v. United States Forest Serv.,* 565 F.3d 545, 549 n. 1 (9th Cir.2009) (citing *Cal. Coastal Comm'n v. Granite Rock Co.,* 480 U.S.

572, 585, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987)) (stating in dicta that the National Forest Management Act provides the Forest Service with authority to regulate surface activities associated with mining), *United States v. Doremus,* 888 F.2d 630, 632 (9th Cir.1989) (upholding application of the notice of intent/plan of operations process to miners). As to the fourth, the Tenth Circuit held that plaintiffs presenting such a claim had failed to identify any authority imposing such a procedural obligation. *Kane County Utah v. Salazar,* 562 F.3d 1077, 1086–88 (10th Cir. 2009).

contracts to support their positions." *Id.* Because, in the majority's view, all parties agreed that the agency might adjust its position in light of the facts of specific contracts and that these facts would bear on the lawfulness of the agency's position, the abstract, facial challenge was not fit for review. Justices Stevens (concurring) and Breyer and O'Connor (dissenting) disagreed with the underlying conclusion that case-specific agency action was forthcoming or pertinent. These justices' opinions thereby illustrated application of the same rule to alternative facts. They would have held that the agency had adopted a blanket policy not subject to case-specific deviations, and therefore fit for review. *Id.* at 814–15, 123 S.Ct. 2026 (Stevens, J., concurring), *id.* at 819–20, 123 S.Ct. 2026 (Breyer, J., joined by O'Connor, J., dissenting).

Finally, in the case that is perhaps the closest factual analogue to the present dispute, the Tenth Circuit has reviewed a challenge to a Forest Service decision that potentially limited miners' access to mine sites in a national forest. *Park Lake Resources,* 197 F.3d 448. The Forest Service had designated nearly 700 acres as a "Research Natural Area" pursuant to 36 C.F.R. § 251.23 (1998). Such areas must be "retained in a virgin or unmodified condition," and in accordance with this designation, the Forest Service prohibited motorized vehicle use except when necessary to provide research or educational access. *Id.* at 449. The Tenth Circuit held that the miners' challenge to this designation was not fit for judicial review because the miners had not presented a plan of operations seeking approval of a particular mining proposal. *Id.* at 451. Had plaintiffs filed a plan of operations, the Forest Service could have approved it despite the Research Natural Area designation. If the Forest Service instead denied the proposal or required modifications thereto, such action could be predicated on a range of statutory and regulatory authorities,

and judicial review of such an action would turn on the particular authority invoked. *Id.; see also Tex. v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998), *Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 163, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (issue unfit for review because "[a]t this juncture we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order."). Moreover, the Forest Service could modify the Research Natural Area designation in light of proposed mining. The Tenth Circuit held that these facts were indistinguishable from those in *Ohio Forestry,* and that the claim was therefore not yet fit for review. *Park Lake Resources,* 197 F.3d at 452.

■ These cases demonstrate that insofar as the claims here argue that the 2008 Plan prohibits access to mining sites, the claims are not fit for judicial decision. When presented with project-specific notices of intent or plans of operation, the Forest Service may approve such plans, with or without modification. Nor can the court yet review the argument that the burden imposed on miners by the notice of intent/plan of operations process amounts to a prohibition on mining. The regulations themselves contemplate that the weight of this burden will vary greatly from proposal to proposal. 36 C.F.R. § 228.4(g) ("The public reporting burden for this collection of information is estimated to vary from a few minutes for an activity involving little or no surface disturbance to several months for activities involving heavy capital investments and significant surface disturbance, with an average of 2 hours per individual response."). The precise amount of time required is at least in part under the control of the Forest Service. It remains to be seen how often the Forest Service will require a plan

of operations, how long such a plan will take to prepare or review, and what expense will be involved therein.

■■■ Plaintiffs' remaining contentions are fit for review. As to the claim that Forest Service lacks the authority to require miners to submit a notice of intent or plan of operations at all, the Forest Service has already determined that a notice of intent is required for any operation that would use roads not open to the general public. FEIS 3–212, 36 C.F.R. §§ 228.4, 212.55(d). Miners are prohibited from such use of roads prior to Forest Service approval. Defendants effectively concede that there will be no case-specific determination as to whether a notice of intent is required. In this regard, this theory of liability is distinct from the claims discussed in *Ohio Forestry, Nat'l Park Hospitality,* and *Park Lake Resources;* this theory of liability is instead the type of "blanket" decision that Justices Stevens, Breyer and O'Connor held was fit for judicial review on a facial challenge in *Nat'l Park Hospitality.* Rather than argue that further agency action or factual development is necessary with regard to this theory of liability, defendants argue that plaintiffs have not shown that valid rights of way exist, that the Forest Service's regulations do not otherwise exempt miners from notice of intent requirement, and that the Forest Service has the authority to impose this requirement. *See, e.g.,* Defs.' Reply at 7–8. Although defendants characterize these arguments as jurisdictional, they instead speak to the merits. Notably, defendants argue that "[t]o the extent Plaintiffs allege that they hold pre-existing rights-of-way even without approval of a plan of operations, Plaintiffs cannot allege ripe challenges to the Decision prior to carrying their burden of proving the validity of the rights-of-way they claim." Defs.' Mem. at 23 (citing *S. Utah Wilderness Alliance v. BLM,* 425 F.3d 735, 768 (10th Cir.2005)). The cited case held that, in

reviewing the merits of a claim asserting rights to an R.S. 2477 roadway, the party asserting the right bore the burden of proof. Ripeness was not an issue in that case. While plaintiffs here may fail to meet the burden of proof on the R.S. 2477 claims, this is a merits analysis separate from ripeness and other justiciability inquiries.

As to the claim that the Forest Service was required to evaluate impacts on existing property rights prior to adopting the 2008 Plan, the Ninth Circuit has held that procedural, rather than substantive, challenges to agency action are fit for decision and ripe once the action is complete. *Laub v. U.S. Dep't of Interior,* 342 F.3d 1080, 1090 (9th Cir.2003), *Citizens for Better Forestry v. U.S. Dep't of Agriculture,* 341 F.3d 961, 977 (9th Cir.2003), *Kern v. BLM,* 284 F.3d 1062, 1070–71 (9th Cir. 2002), *West v. Sec'y of Dep't of Transp.,* 206 F.3d 920, 930 n. 14 (9th Cir.2000), *Wilderness Soc'y v. Thomas,* 188 F.3d 1130, 1133 n. 1 (9th Cir.1999).

### b. Hardship to Plaintiffs

In assessing whether delayed review will impose a hardship on plaintiffs, the core inquiry is the nature of the challenged action. The Court has held that there is no hardship where the challenged actions "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations." *Ohio Forestry,* 523 U.S. at 733, 118 S.Ct. 1665 (citing *United States v. Los Angeles & Salt Lake R. Co.,* 273 U.S. 299, 309–10, 47 S.Ct. 413, 71 L.Ed. 651 (1927) (Brandeis, J.)). In contrast, the Court has found hardship when a challenged rule required plaintiff drug manufacturers to either "change all their labels, advertisements, and promotional materials; ... destroy stocks of printed matter;

and ... invest heavily in new printing type and new supplies" or to "risk serious criminal and civil penalties for the unlawful distribution of 'misbranded' drugs." *Abbott Labs.*, 387 U.S. at 152–53, 87 S.Ct. 1507.

By focusing on changes in legal right or obligation, the ripeness doctrine's hardship inquiry excludes certain harms from consideration. For example, *Ohio Forestry* recognized that it would be cheaper and more expedient for plaintiffs to litigate a single facial challenge to the disputed land use plan than to challenge individual applications thereof. 523 U.S. at 734, 118 S.Ct. 1665. Litigation expense and inconvenience, however, were not the type of hardship "sufficient by itself to justify review in a case that would otherwise be unripe." *Id.* at 735, 118 S.Ct. 1665. Similarly, in *Nat'l Park Hospitality,* because the challenged interpretation pertained solely to how contractual disputes would be resolved, the rule did not affect the concessioners' "primary conduct," and the concessioners were "free to conduct [their] business as [they] saw fit." 538 U.S. at 810, 123 S.Ct. 2026. As such, the interpretation was not a command, a prohibition, or a license. *Id.* at 809, 123 S.Ct. 2026 (citing *Ohio Forestry* ). Although the concessioners argued that the interpretation created uncertainty as to whether the concessioners would be able to invoke the cost-saving dispute resolution provisions of the Contract Disputes Act, the Court held that this type of harm was irrelevant. *Id.* at 811, 123 S.Ct. 2026. The mere fact that "business transactions could be priced more accurately if ... a small portion of existing legal uncertainties were resolved" was inadequate to create a hardship pertinent to the ripeness inquiry. *Id.* The Court further observed that the challenged interpretation was a "general statement of policy" rather than a "legislative regulation with the force of law." *Id.* at 808–09, 123 S.Ct. 2026.

Here, although the challenged plan does not conclusively prohibit miners' motorized travel on formerly open roads, the plan commands the miners to refrain from such travel absent application for and receipt of a grant of permission, and subjects the miners to criminal and civil liability should they proceed without such authorization. *See Bator v. United States,* No. Cr. S–09–424, 2010 WL 2044707, 2010 U.S. Dist. LEXIS 57705 (E.D.Cal. May 19, 2010) (affirming criminal conviction for mining operations conducted in a national forest without authorization). Thus, miners must either refrain from using roads or pay the as-yet uncertain cost of filing a notice of intent or plan of operations.

Although *Ohio Forestry* and *Nat'l Park Hospitality* held that certain costs incident to agency action were not hardships pertinent to the ripeness analysis, the Ninth Circuit has held that costs directly commanded by agency action are relevant. *Sayles Hydro Associates v. Maughan,* 985 F.2d 451, 454 (9th Cir.1993). In *Sayles,* plaintiffs had the requisite federal licenses to construct a hydroelectric power project, but the California State Water Resources Control Board had not issued a required permit. Plaintiff challenged the process imposed by the Board, and the Board argued that because this process was not complete, the challenge was unripe. The Ninth Circuit explained that "[i]f a federal licensee must spend years attempting to satisfy an elaborate, shifting array of state procedural requirements, then he must borrow a fortune to pay lawyers, economists, accountants, archaeologists, historians, engineers, recreational consultants, environmental consultants, biologists and others, with no revenue, no near-term prospect of revenue, and no certainty that there ever will be revenue." *Id.*

Defendants argue, without discussion of *Sayles,* that the burdens of compliance

with administrative procedures cannot constitute a hardship for purposes of ripeness.[12] The decisions cited by defendants concerned a separate question: whether agency action is final for purposes of the Administrative Procedure Act. *FTC v. Std. Oil Co.*, 449 U.S. 232, 244, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), *Ukiah Valley Medical Center v. FTC*, 911 F.2d 261, 264 (9th Cir.1990). These two cases concerned challenges to issuance of administrative complaints, and held that although the agency action obliged plaintiff to incur the "expense and disruption of defending itself in protracted adjudicatory proceedings," such injury was insufficient to render the action "final agency action" under the APA. *Std. Oil*, 449 U.S. at 244, 101 S.Ct. 488; *see also Ukiah Valley Med. Center*, 911 F.2d at 264. In this case, plaintiffs do not rely on the cost of proceedings to demonstrate the *finality* of agency action. The administrative complaints at issue in *Standard Oil* and *Ukiah Valley* marked the beginning of the administrative process, but here, the challenged decision was reached at the culmination of the NEPA process and is undoubtedly a "final agency action" within the meaning of the APA. Accordingly, the statutory limit recognized by *Standard Oil* and *Ukiah Valley* is absent here.

### c. Weighing Hardship against Fitness for Review

Accordingly, the court concludes that two of the issues are unfit for judicial review, two of the issues are fit, and that the plan (and hence delayed review thereof) imposes some hardship on the plaintiffs. *Abbott Labs., Ohio Forestry, Nat'l Park Hospitality*, and *Park Lake Resources* provide no direct guidance for situations in which the fitness and hardship aspects of the ripeness inquiry point in opposing directions. Indeed, neither party has cited a case discussing synthesis of these factors or, more specifically, how to approach situations in which the ripeness factors provide contrary indications.

■ Beginning with the two theories of liability that are fit for review, the D.C. Circuit has repeatedly held that where an issue is fit for review, the ripeness doctrine imposes no independent "hardship" requirement beyond the requirement of injury sufficient to convey Article III standing. *See, e.g., AT & T Corp. v. FCC*, 349 F.3d 692, 700 (D.C.Cir.2003), *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 493 (D.C.Cir.1988). Neither the Ninth Circuit nor the Supreme Court have explicitly addressed this question, but the court is not aware of any decision holding to the contrary. Put differently, no binding authority has concluded that an issue was fit for review, that the plaintiff had demonstrated injury sufficient to convey standing, but that the lack of further hardship demonstrated that the issue was unripe.[13] Because the D.C. Circuit's rule properly reflects the concerns underlying the ripeness doctrine, the court follows this rule here.

---

**12.** The court recognizes that plaintiffs did not cite *Sayles* either.

**13.** Standing and ripeness doctrines overlap, and as such, few cases have squarely addressed whether ripeness may require a showing of hardship beyond that required by standing. *C.f. Nat'l Park Hospitality*, 538 U.S. at 815, 123 S.Ct. 2026 (Stevens, J., concurring). In *Nat'l Park Hospitality*, Justice Breyer's dissent characterized the majority as having concluded that plaintiffs had standing notwithstanding the fact that plaintiffs had not demonstrated a hardship for the ripeness inquiry.

The D.C. Circuit has explicitly reached such a conclusion, holding that plaintiffs had standing to bring a claim which was nonetheless unripe, basing the ripeness conclusion both on the unfitness for judicial resolution and the lack of hardship. *Nat'l Treasury Emples. Union v. Chertoff*, 452 F.3d 839, 855 (D.C.Cir.2006).

Accordingly, although the amount of hardship is uncertain and potentially minimal, these two theories of liability are ripe so long as the hardship is sufficient to demonstrate Article III standing. The court postpones the standing question until part II(C)(6), below.

As to the two theories of liability that are unfit review, the question is whether a sufficient showing of hardship may render the issues ripe notwithstanding the determination of unfitness, and if so, whether such a hardship has been shown here. The court assumes that a severe hardship may outweigh a showing of unfitness, although the court is not aware of any decision finding a claim ripe for this reason. The Supreme Court has stated in dicta that the converse is possible, i.e., that a claim may be unripe despite a showing of definite hardship. *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 300, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (quoting *Reg'l Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974)) ("Even though a challenged statute is sure to work the injury alleged, however, adjudication might be postponed until 'a better factual record might be available.'"). In this case, the minimal hardship plaintiffs will suffer does not warrant immediate judicial adjudication of plaintiffs' claims that the Plan will prohibit mining.

Accordingly, claims II, VI through IX, XI through XIII, XVI, XVII, XVIII, and XX are dismissed as unripe insofar as they argue that the 2008 Plan will result in *de jure* or *de facto* prohibition of motorized vehicle access to mining claims. All of these claims are ripe insofar as they involve the third and fourth theories of liability discussed above.

### 3. Sovereign Immunity and The Quiet Title Act

 Suits against the United States are barred absent a waiver of sovereign immunity. *Block v. N.D.,* 461 U.S. 273, 280, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). Where claims "challenge the United States' title to real property," the United States has provided a narrow waiver, consenting only to those suits that may be brought under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a. *Block,* 461 U.S. at 286, 103 S.Ct. 1811; *see also Leisnoi, Inc. v. United States,* 170 F.3d 1188, 1191 (9th Cir.1999). If an adverse claim to title to real property cannot be brought under the QTA, it cannot be brought at all. *Leisnoi,* 170 F.3d at 1191 (citing *Alaska v. Babbitt,* 75 F.3d 449, 453 (9th Cir.1996)) ("*Alaska II* "). Where a claim involves a title dispute, a plaintiff cannot circumvent this bar by, for example, posturing the claim as one against a federal official or as a claim that a government agency action was *ultra vires. Alaska II,* 75 F.3d at 453.

Here, defendants argue that claims II, VI through IX, XVI, and XVII all present adverse claims to title to real property, that none of these are brought under the QTA, and that these claims are therefore barred by the United States' sovereign immunity.[14] Defendants separately argue that sovereign immunity bars counts XIV, XVIII, and XX for reasons other than the QTA. The court discusses these claims in parts II(C)(4) and (5), below.

To determine whether a cause of action presents an adverse claim to real property, the court must look to the particulars of the cause of action. The court reiterates that the complaint in this case is such that these particulars are difficult to discern. As noted in the prior section, these chal-

---

**14.** These are a subset of the claims challenged on ripeness grounds. The court summarized each of these claims in note 10, above.

lenged claims advance two ripe theories of liability: the substantive argument that the Forest Service lacks authority to require miners to receive approval for a notice of intent or plan of operations before using closed roads, and the procedural argument that the Forest Service should have identified pre-existing rights of way prior to adoption of the 2008 Plan.

### a. Whether These Claims' Substantive Theory Rests on Adverse Claims of Title to Real Property

Plaintiffs argue that the challenged claims need not be brought under the QTA because "[t]he primary issue in this lawsuit is not a question of 'title.' The primary issue is 'closure,' and the Forest Service's right to do so." Opp'n to Mot. to Dismiss at 13. The distinction plaintiffs attempt to draw collapses, however, where plaintiffs argue that the Forest Service lacks the right to close a road because of an easement or other property interest in the road.

### i. R.S. 2477 Roads (Claims VIII and IX)

Some of plaintiffs' claims are clearly predicated on property interests. Claims VIII and IX argue that the Forest Service lacked the authority to close certain roads because public highways had been established thereon pursuant to R.S. 2477. Compl. ¶¶ 165–174. Under R.S. 2477 and the related statutes, establishment of a highway created a right of way, which is an easement and thus a property right. *Sierra Club v. Hodel,* 848 F.2d 1068, 1083 (10th Cir.1988), *overruled on other grounds by Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970, 973 (10th Cir.1992) (*en banc*). This property right vests in the local county. *Id.* The plan did not recognize R.S. 2477 rights on closed roads, demonstrating that the United States disputes plaintiffs' contention that such rights exist. Two lines of caselaw, when combined, demonstrate that the plaintiffs here cannot bring suit to vindicate disputed R.S. 2477 rights.

First, as noted above, where a claim disputes the United States' title, the claim cannot be brought under the APA. *Alaska II,* 75 F.3d at 453. The Ninth Circuit has specifically held that a claim under the APA is barred by sovereign immunity where the APA claim sought a determination that would, in effect, vest in a third party property rights adverse to the United States. *Metropolitan Water Dist. v. United States,* 830 F.2d 139, 143 (9th Cir. 1987) (per curiam), *aff'd sub nom. California v. United States,* 490 U.S. 920, 109 S.Ct. 2273, 104 L.Ed.2d 981 (1989); *see also Alaska v. Babbitt,* 38 F.3d 1068, 1074 (9th Cir.1994) ("*Alaska I* ") (The QTA governs "suits involving plaintiffs who, while not seeking to quiet title in themselves, might potentially affect the property rights of others through successfully litigating their claims."). The Seventh Circuit has rejected claims similar to those at issue here, largely on the basis of *Metropolitan Water Dist. Shawnee Trail Conservancy v. USDA,* 222 F.3d 383, 386 (7th Cir.2000). In *Shawnee Trail Conservancy,* plaintiffs argued that designation of areas of a National Forest as Research Natural Areas, and concomitant closure of roads and trails, violated easements and rights of way owned by third party public and private entities. *Id.* The Seventh Circuit held that the QTA precluded plaintiffs' APA claim, despite the fact that plaintiffs did not themselves seek title in any property interest. *Id.* at 387–88 (citing *Metropolitan Water Dist.,* 830 F.2d at 143–44). Thus, plaintiffs' claims predicated on the existence of R.S. 2477 rights not acknowledged by the Forest Service cannot be brought under the APA.

A second line of cases holds that plaintiffs cannot bring their substantive

R.S. 2477 claims under the QTA either. "Courts which have addressed whether a plaintiff, as a member of the public, can assert a title under the Quiet Title Act for access to routes established pursuant to R.S. 2477 have ruled that there is no subject matter jurisdiction." *Friends of Panamint Valley v. Kempthorne*, 499 F.Supp.2d 1165, 1175 (E.D.Cal.2007) (O'Neill, J.) (following *Sw. Four Wheel Drive Ass'n v. BLM*, 363 F.3d 1069 (10th Cir.2004), *Long v. Area Manager, Bureau of Reclamation*, 236 F.3d 910, 915 (8th Cir.2001), and *Kinscherff v. United States*, 586 F.2d 159, 160 (10th Cir.1978)); *see also Hazel Green Ranch, LLC v. United States DOI*, No. 07–CV–00414, 2008 WL 4755325, *3–4, 2008 U.S. Dist. LEXIS 87367, 10–11 (E.D.Cal. Oct. 27, 2008) (Wanger, J.) (following *Panamint*), *Alleman v. United States*, 372 F.Supp.2d 1212, 1225 (D.Or. 2005). These cases have reasoned that the right to use a public road is not itself a right or interest in property. The QTA requires the plaintiff to set forth "the nature of the right, title, or interest *which the plaintiff claims* in the real property." 28 U.S.C. § 2409a(d) (emphasis added), *see also McMaster v. United States*, 177 F.3d 936, 939 (11th Cir.1999) (for suit to be available under the QTA, the "dispute ... must concern the quality of title between the plaintiff and the United States and not the quality of title between the United States and a third party."). Thus, a suit seeking to assert an R.S. 2477 right must be brought by "the governmental entity that owns the easement." (*Long*, 236 F.3d at 915).

The court recognizes that plaintiffs claim an interest (albeit not a real property interest) in use of disputed R.S. 2477 roads. The United States has not chosen to waive sovereign immunity in a way that permits plaintiffs to seek to vindicate this interest. As the Ninth Circuit has explained in discussing another context in which plaintiffs were barred from seeking relief, "[t]he QTA's limitations on actions challenging the United States' assertions of title apply without regard to the ultimate validity of those assertions. . . . [T]he immunity of the government applies whether the government is right or wrong." *Alaska II*, 75 F.3d at 452 (internal quotations omitted). Insofar as plaintiffs' eighth and ninth claims assert that the Forest Service's authority to require notices of intent or plans of operation is substantively limited by the existence of disputed R.S. 2477 rights, those claims are barred by sovereign immunity.

### ii. Private Easements (Claim XVI)

Plaintiffs' sixteenth claim alleges that plaintiffs' mining claims and mineral estates give rise to "implied easements by necessity over the roads, trails, and rights of way in the ENF," and that the Forest Service's actions violate these easement rights. Compl. ¶¶ 210–212. Such easement rights are property rights within the scope of the QTA. *Alaska I*, 38 F.3d at 1074 (collecting cases). Although claim XVI does not invoke a particular cause of action, the parties agree that this claim, as pled, is not brought under the QTA. Opp'n to Mot. to Dismiss at 35–36.

Although it is unclear whether the United States disputes the *existence* of such easements, the parties at a minimum dispute such easements' *scope*. The EIS and Forest Service regulations recognize that miners have existing rights of access, and this may be a recognition of easement rights. Plaintiffs' only ripe claim regarding easements, however, asserts the Forest Service lacks any authority to restrict plaintiffs' use of these easements, whereas defendants contend that whatever the nature of plaintiffs' rights, plaintiffs do not have a right so broad as to prohibit such regulation. Disputes about the scope of an easement, like disputes about whether an easement exists at all, must be brought

under the QTA. *Kane County,* 562 F.3d at 1088–89.

Insofar as plaintiffs contend that easement rights owned by plaintiffs deprived the Forest Service of authority to regulate certain roads, this claim can only be brought under the QTA. *Montanans for Multiple Use v. Barbouletos,* 568 F.3d 225, 228–229 (D.C.Cir.2009), *Kane County,* 562 F.3d at 1088, *Duval Ranching Co. v. Glickman,* 965 F.Supp. 1427, 1444–45 (D.Nev.1997).

### iii. Claims Asserting other "Rights–of–Way" (Counts II, VI, VII, and XVII)

Defendants further argue that plaintiffs' second, sixth, seventh, and seventeenth claims are similarly barred. Each of these claims similarly argues, at least in part, that the Forest Service lacked authority to close roads because of rights of way across Federal Land, whether enjoyed by the public in general or by miners in particular. *See* Compl. ¶¶ 106, 154, 158, 214.

The nature of these purported rights of access is unclear. Mining claims, whether patented or not, are real property. *United States v. Shumway,* 199 F.3d 1093, 1100 (9th Cir.1999). This suggests that any right of access existing as a result of the mining claim is also a real property interest. *See Duval Ranching Co.,* 965 F.Supp. at 1445 (claims asserting that road closures violated miners' "inherent rights" must be brought under the QTA). Insofar as plaintiffs invoke statutory protections of miners' rights, however, it is not immediately apparent whether these statutes direct the Forest Service to protect miners' property rights, or whether these statutes somehow create an independent obligation to leave the National Forest open to mining generally. Nor is it clear whether the latter would be a property right. Similarly, it is not clear that a statute providing the public with access to the National Forests creates a property right in such access or a cloud on the United States' title. No party has confronted these questions.

The court declines to reach these issues on the present motion. Instead, the court dismisses these claims for the reasons explained in the remainder of this order. If plaintiffs are able to cure the other jurisdictional defects, doing so will present a more complete context in which to revisit these issues.

### b. Claims Arguing That The Forest Service Must Consider Whether Rights–of–Way Are Present Need Not Be Brought under the QTA

■ As discussed above, the court construes plaintiffs' complaint as arguing that the Forest Service was obliged to determine whether rights of way existed prior to adopting the 2008 Plan. In *Kane County,* the Tenth Circuit held that such a claim did not challenge the United States' title. There, plaintiffs sought to compel the federal defendants to "determine [p]laintiffs' valid existing rights before asserting or taking any action in enforcement or implementation of [the challenged plan]" and to "remove any physical barriers placed upon any right-of-way or road within the [subject lands] until such time as it has been determined that such actions will not impair valid existing rights." 562 F.3d at 1082; *see also id.* at 1088. Thus, rather than arguing that defendants had substantively interfered with plaintiffs' property rights, plaintiffs argued that defendants have a procedural, 'stop and think' obligation prior to acting.

*Kane County* held that "nothing in the Quiet Title Act necessarily preclude[d]" this claim. *Id.* at 1088; *accord Duval Ranching Co.,* 965 F.Supp. at 1445. The court agrees. In the same breath, however, *Kane County* dismissed the claim on the merits, explaining that plaintiffs had "failed to point to any provision of federal law that would require the BLM to per-

form the actions they are seeking (i.e., the non-binding administrative determination of their purported rights-of-way). In other words, Quiet Title Act aside, the County plaintiffs' APA-based claims lack merit." 562 F.3d at 1088 (footnote omitted). The court postpones evaluation of the merits of these claims.

### c. Summary of the QTA and Sovereign Immunity

Defendants argue that the counts II, VI through IX, XVI and XVII exceed the limited waiver of sovereign immunity embodied by the QTA. The court addresses this argument only insofar as these claims were found to be ripe. The court concludes that counts XVIII, IX, and XVI are barred by sovereign immunity insofar as they involve the ripe substantive argument. The court does not determine whether sovereign immunity bars the substantive argument as advanced by counts II, VI, VII and XVII, instead dismissing this aspect of these claims on other jurisdictional grounds. Sovereign immunity does not bar the procedural argument at all.

### 4. Sovereign Immunity and Plaintiffs' Takings and Damages Claims (Counts XVIII and XX)

Count XVIII of the complaint alleges that the 2008 Plan effectuated a taking for which plaintiffs have not received compensation. Count XX is a general claim for "damages." These claims are ripe only insofar as they allege that the Forest Service lacked any authority to regulate miners' use of roads or that the Forest Service was required to inventory rights of way. Plaintiffs' complaint seeks "such damages as are proven at trial," without specifying an amount. Compl. at 71.

As noted, claims against the United States are barred absent a waiver of sovereign immunity. Plaintiffs have identified no waiver applicable to these claims. De-

fendants argue that the only potential waivers are those found in the Tucker Act and Little Tucker Act, 28 U.S.C. §§ 1491(a)(1) and 1346(a)(2), respectively. Both waive sovereign immunity for claims for money damages against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department." The Little Tucker Act, however, solely conveys jurisdiction over claims for $10,000 or less, and the Tucker Act solely conveys jurisdiction on the Federal Court of Claims. *See Christopher Vill., L.P. v. United States,* 360 F.3d 1319, 1332 (Fed.Cir.2004) (citing *E. Enters. v. Apfel,* 524 U.S. 498, 520, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998)).

If plaintiffs seek to proceed before this court, and if plaintiffs identify no waiver of sovereign immunity other than the Little Tucker Act, plaintiffs must waive the right to recover greater than $10,000 in damages per claim. *Smith v. Orr,* 855 F.2d 1544, 1553 (Fed.Cir.1988) (citing, *inter alia, United States v. Johnson,* 153 F.2d 846, 848 (9th Cir.1946)); *see also Clouser,* 42 F.3d at 1539–40 ("Since plaintiffs in their complaint allege damages in excess of $ 10,000, ... they are disqualified from suing in the [District of Oregon].").

Defendants argue that such a waiver must appear in the complaint itself. The court need not decide this issue. Even if defendants are correct, the court must examine the remaining jurisdictional challenges to these claims, so as to determine whether the Federal Court of Claims would have jurisdiction if this court were to transfer the case. Because plaintiffs lack standing to bring these claims, no federal court has jurisdiction. Plaintiffs are cautioned, however, to be prepared to respond to the above issues if plaintiffs file an amended complaint.

### 5. Sovereign Immunity and Plaintiffs' Regulatory Flexibility Act Claim

Count XIV of the complaint alleges that the Forest Service violated the Regulatory Flexibility Act by failing to prepare an "initial regulatory flexibility analysis" for the 2008 Plan in purported violation of 5 U.S.C. § 603(b)-(c). Defendants argue that plaintiffs have failed to exhaust administrative remedies with respect to this claim. The Ninth Circuit has held that a plaintiff challenging administrative action by the Forest Service must exhaust administrative remedies before filing suit. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir.2002) (citing 5 U.S.C. § 704, 7 U.S.C. § 6912(e)).

Defendants assert, without citation to authority, that this exhaustion requirement is jurisdictional. The Ninth Circuit has explicitly held to the contrary, although the issue is one that has engendered significant confusion among the courts. *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 976 (9th Cir.2002) (7 U.S.C. § 6912(e) is non-jurisdictional); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 828 n. 5, 830 (9th Cir.2002) (in a suit against the Forest Service, holding that "5 U.S.C. § 704 [is] a non-jurisdictional statutory exhaustion requirement"), *but see Doria Mining & Engineering Corp. v. Morton*, 608 F.2d 1255, 1257 (9th Cir.1979) (in reviewing a claim against the Department of Interior, holding that "When the regulations governing an administrative decision-making body require that a party exhaust its administrative remedies prior to seeking judicial review, the party must do so before the administrative decision may be considered final and the district court may properly assume jurisdiction.") (citing, *inter alia*, 5 U.S.C. § 704).[15]

Nonetheless, as a practical matter, because defendants raise exhaustion and make no other purported jurisdictional challenges to this claim, it does not matter whether exhaustion is jurisdictional; it suffices to note that under *Native Ecosystems Council*, etc., the requirement is mandatory absent exceptions not relevant here. 304 F.3d at 899.

Defendants concede that some plaintiffs invoked administrative remedies by commenting on the draft EIS and by filing some appeals of the decision. *See* Defs.' Mem. Supp. Mot. Dismiss at 47. Nonetheless, defendants contend that no person invoked the Regulatory Flexibility Act in these proceedings.

In determining how specific plaintiffs must be during administrative proceedings in order to exhaust an issue, the Ninth Circuit has explained that "[t]he plaintiffs have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the Forest Service to afford it the opportunity to rectify the violations that the plaintiffs alleged." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir.2002). In *Native Ecosystems Council*, the Ninth Circuit held that plaintiffs' administrative appeals were "less refined" than the judicial complaint, in that the administrative appeals failed to argue that an EIS was required for a proposed Forest Plan amendment or that the Forest Service was required to consider the cumulative significance of all road density amendments. *Id.* at 898. The administrative appeals nonetheless objected to the road density amendments generally and argued that the process by which the amendments were adopted violated NFMA's procedural requirements, the source of the EIS requirement in that

---

**15.** Exhaustion may also (or, depending on the analysis, accordingly) be waived. Defendants' present motions do not argue that plaintiffs failed to exhaust any of their other claims, and the court need not consider this issue *sua sponte*.

case. *Id.* at 899. The court held that plaintiffs' administrative filings were sufficient to put the Forest Service on notice of the disputed issues, and that plaintiffs had exhausted their claims.

In contrast, the Ninth Circuit held that a plaintiff had failed to exhaust claims in *Buckingham v. Sec'y of the USDA,* 603 F.3d 1073 (9th Cir.2010). Plaintiff had a permit to graze cattle in a national forest, the Forest Service cancelled this permit, and plaintiff challenged this cancellation under the APA. *Id.* at 1076. During administrative proceedings, plaintiff argued that other ranchers' non-compliance with their permit obligations precluded plaintiff from complying with the terms imposed by his permit. *Id.* at 1081. The court held that under *Native Ecosystems Council,* this was insufficient to exhaust plaintiff's argument that the terms of his own permit were vague. *Id.*

■ Here, plaintiff Hobbs argued during the administrative process that " [c]los[ing] the roads to small miners and prospectors" would impose an economic hardship on said miners. Pls.' Opp'n to Mot. Dismiss, 33. This argument plainly challenges the substance of the decision to close roads. Plaintiffs' Regulatory Flexibility Act claim concerns administrative burdens, rather than access to the roads themselves. Plaintiffs argue that the Forest Service was required to describe the "projected reporting, recordkeeping and other compliance requirements of the proposed rule" and other "relevant Federal rules which may duplicate, overlap, or conflict with the proposed rule." Compl. ¶ 198. Plaintiffs' apparent failure to even mention this sort of administrative burden during the administrative process demon-

strates that plaintiffs failed to put the Forest Service on notice of the basis for plaintiffs' Regulatory Flexibility Act claim, and this claim is therefore unexhausted.

■ Separate from the Regulatory Flexibility Act argument, count XIV of the complaint further asserts that defendants have violated 43 U.S.C. § 1732(b), which provides that "the Secretary shall, . . . regulate, through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate, . . . the development of small trade or manufacturing concerns." *See* Compl. ¶ 200. The court agrees that "Secretary," as used in this section, refers solely to the Secretary of the Interior, such that this statute does not apply to the defendants in this suit. *Western Mining Council v. Watt,* 643 F.2d 618, 625 (9th Cir.1981), 43 U.S.C. § 1702(g).

## 6. Standing

Defendants' final jurisdictional argument is that plaintiffs lack standing to bring claims II through IX, XI through XIII, XVI through XVIII, and XX.[16] To demonstrate Article III standing,

> a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.,* —— U.S. ——, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528

---

**16.** Put differently, defendants do not challenge plaintiffs' standing to bring claims I, X, XIV, XV, and XIX. Plaintiffs stipulate to dismissal of claim XV, and the court has dismissed claims X and XIV on the merits.

Thus, the only surviving claims as to which defendants do not challenge standing are I, for violation of NEPA, and XIX, a general prayer for injunctive relief.

U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■■■ Defendants solely challenge plaintiffs' showing of injury. The parties' dispute on this issue is narrow. Defendants characterize the challenged claims as resting on the injury of interference with access to particular mining claims. Plaintiffs embrace this interpretation of the injury at issue.[17] The parties further agree that to demonstrate such an injury, plaintiffs will ultimately be required to specify particular mining claims and particular road closures that limit plaintiffs' ability to access those claims. Plaintiffs have not done so.

The evidence demonstrates that plaintiffs could provide these specific facts now, although plaintiffs contend to the contrary. At the time the FEIS and ROD were issued, around March 31, 2008, the Forest Service made available a map showing all roads open for public use under the 2008 Plan. Decl. of Lester Lubetkin dated Apr. 20, 2010, at ¶¶ 3, 8, and Ex. 1. This map was made available online, at meetings which plaintiffs Bunting and Burleson signed in as attending, and was mailed to Bunting, Burleson, and all others who submitted comments on the earlier draft EIS. *Id.* ¶ 8. The Forest Service subsequently produced "Motor Vehicle Use Maps" in March 2009, which pertain to each district within the ENF, and which have been freely available online and at district offices since that time. Because the 2008 Plan prohibits the general public from using roads not explicitly designated as open, these maps should enable plaintiffs to determine whether the roads needed to ac-

cess specific mining claims are open to public use.

Plaintiffs respond to this evidence by arguing that the Forest Service should have provided a map indicating specifically which roads were closed, in addition to a map showing which roads remain open. Plaintiffs provide no logical argument as to why such a map would be necessary, nor do plaintiffs identify any legal obligation to produce such a map. Moreover, the FEIS map showing roads open under the 2008 Plan was accompanied by a map showing all roads in the ENF of which the Forest Service was aware, including previously unauthorized roads. *Id.* Ex. 2. This second map was also distributed to plaintiffs Bunting and Burleson. Comparison of this map with the others reveals which roads were closed.

Plaintiffs further argue that these maps are vague in that they "lack information such as context [and] landmarks," that the maps are "often broken up where the route crosses private land," and that they "assume that users can tell the difference between a route on the map, or a spur omitted from the map." Plaintiffs have not identified how any of these purported difficulties apply to the roads needed to access any particular claim.

The only remaining dispute is plaintiffs' contention that they "are not required to plead the name and location of every road closed in the ENF that causes them harm; that awaits discovery." Opp'n to Mot. to Dismiss, 36:4–6; *see also, e.g., id.* at 13:08–11, 16:07–08. Courts have held that when standing is challenged "at the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct

---

17. It appears that other injuries are possible. The court does not inquire into these possible injuries, leaving it to plaintiffs to assert these injuries as a basis for standing, if appropriate, in a future filing. Nor does the court look beyond plaintiffs' implicit concession that interference with the ability to access particular mining claims is necessary to convey standing for plaintiffs' procedural theories of liability regarding identification of R.S. 2477 claims.

may suffice,' because we ' "presume that general allegations embrace those specific facts that are necessary to support the claim." ' " *Or. v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir.2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). The court is furthermore sensitive to the need to avoid imposition of heightened pleading requirements. *See, e.g., Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 333 (2d Cir.2009). Nonetheless, in this case, it is appropriate to require greater specificity at this stage. The caselaw permits the defendants to challenge the truth and sufficiency of the jurisdictional allegations in a 12(b)(1) motion on a standard similar to that used for summary judgment. *Farr*, 990 F.2d at 454. On such a challenge the plaintiff is entitled to the procedural protections afforded at the summary judgment stage. *Id.* at 454 n. 1. One such protection is the right to postpone adjudication pending necessary discovery. *Id.* at 454, *see also* Fed.R.Civ.P. 56(f)(2). In this case, however, plaintiffs have not identified any need for discovery on this jurisdictional question. Nor have plaintiffs identified any other factor preventing plaintiffs from providing this specificity now. Rule 56(f) provides that a motion for summary judgment may be postponed or denied where opposing party shows "that, *for specified reasons*, it cannot present facts essential to justify its opposition." (emphasis added). Plaintiffs have not provided such reasons here.

Accordingly, plaintiffs have not demonstrated standing to bring claims II through IX, XI through XIII, XVI through XVIII, and XX.

**D. Remaining Merits Arguments**

The above analysis fully disposes of defendants' motion to dismiss. Plaintiffs abandon claim XV, the court dismisses claims X and XIV on the merits, and defendants do not seek dismissal of claims I and XIX. The remaining claims are dismissed for lack of jurisdiction, on the basis of a number of jurisdictional defects.

The court emphasizes that it has not reached the merits of the jurisdictionally defective claims. In order to guide future litigation of this case, the court has noted various cases potentially pertinent to the merits of these claims, but the court has not determined that these cases provide the controlling rules or apply to this case. Conversely, plaintiffs should not take the court's silence on merits arguments raised by defendants as an indication that those arguments have been rejected.

## III. Motion for a More Definite Statement

Fed.R.Civ.P. 12(e) provides in pertinent part that

A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired.

Because of the liberality of the notice pleading system, such a motion will be granted only in rare circumstances. The Ninth Circuit has held that the federal rules ordinarily do not require the pleader to set forth "the statutory or constitutional basis for his claim, only the facts underlying it." *McCalden v. California Library Ass'n*, 955 F.2d 1214, 1223 (9th Cir.1990) (reviewing a Rule 12(b)(6) motion); *but see Balistreri*, 901 F.2d at 699 (complaint may be dismissed under Rule 12(b)(6) where complaint fails to support "a cognizable legal theory."). "A motion for a more definite statement is used to attack unin-

telligibility, not mere lack of detail, and a complaint is sufficient if it is specific enough to apprise the defendant of the substance of the claim asserted against him or her." *San Bernardino Pub. Employees Ass'n v. Stout,* 946 F.Supp. 790, 804 (C.D.Cal.1996). A motion for a more definite statement should be denied "where the information sought by the moving party is available and/or properly sought through discovery." *Famolare, Inc. v. Edison Bros. Stores, Inc.,* 525 F.Supp. 940, 949 (E.D.Cal.1981). "Thus, a motion for a more definite statement should not be granted unless the defendant literally cannot frame a responsive pleading." *Bureerong v. Uvawas,* 922 F.Supp. 1450, 1461 (C.D.Cal.1996) (citing *Boxall v. Sequoia Union High School District,* 464 F.Supp. 1104, 1114 (N.D.Cal. 1979)).

In this case, defendants argue that plaintiffs' first claim must be more definitely stated not because the allegations are too scant, but because the allegations are so plentiful and unstructured as to be unintelligible. Plaintiffs' first claim, as labeled by plaintiffs, alleges that defendants violated NEPA, and plaintiffs' opposition to the present motion acknowledges that such claims are brought under the APA, 5 U.S.C. § 706(2). Belying this simple summary, the complaint as pled consists of twenty-four lengthy paragraphs covering eleven pages, with more than thirty citations to various legal authorities that do not clearly relate to any recognizable claim under NEPA. Defendants accurately summarize these issues:

> it is unclear whether Plaintiffs are alleging a single claim or multiple claims under NEPA through Claim I. Plaintiffs have pled that the Decision violates NEPA under a single Claim in their Complaint, but appear to assert several violations of NEPA. For example, some paragraphs seem to relate to the alternatives analysis required under NEPA, *see e.g., id.* at ¶ 84, ¶ 91, and ¶ 98, while other paragraphs seem to relate to the cumulative impacts analysis required by NEPA, *see e.g., id.* at ¶ 89, ¶ 95–96. As a third potential claim, Plaintiffs seem to assert the novel concept that the Forest Service failed to produce a supplemental environmental impact statement ("SEIS") before completing the FEIS. . . .

> The unreasonableness of having to develop a responsive pleading is underscored by the inclusion of several paragraphs that make little or no reference to NEPA, and it is unclear whether Plaintiffs intend for some of these allegations to present new non-NEPA related claims, or whether Plaintiffs intend these paragraphs to serve some other purpose. *See e.g.,* Complaint at ¶ 85 (alleging violation of the Omnibus Consolidated Appropriations Act of 1997), ¶ 89 (alleging violations of Executive Orders 12291 and 12866, and ¶ 92) (alleging statutory rights to mine and prospect in the ENF). While Plaintiffs may or may not have a purpose in including such paragraphs under Claim I, it clearly does not serve the purpose of a pleading according to Rule 8 and is amenable to relief under Rule 12(e). Any amended complaint should be more concise, and identify only those factual allegations truly relevant to Plaintiffs' NEPA claim(s).

Defs.' Mem. Supp. Mot. for More Definite Statement, 6–7. The court agrees that defendants cannot frame a response to this claim. The Ninth Circuit has held that "even though a complaint is not defective for failure to designate the statute or other provision of law violated, the judge may in his discretion, in response to a motion for more definite statement under Federal Rule of Civil Procedure 12(e), require such detail as may be appropriate in the particular case." *McHenry v. Renne,* 84 F.3d

1172, 1179 (9th Cir.1996). *McHenry* described the complaint at issue as "argumentative, prolix, replete with redundancy, and largely irrelevant." *Id.* at 1177. The allegations here are argumentative, prolix, and redundant, and neither the court nor defendants can determine whether they are irrelevant.

Accordingly, defendants' motion for a more definite statement is granted. Plaintiffs are ordered to file an amended complaint, splitting the allegations currently contained in Count I into separate causes of action for each theory of liability. In these separate causes of action, plaintiffs must identify the challenged aspect of the plan or conduct of defendant, the right offended, and the source of that right. Where plaintiffs contend that a right is protected under multiple sources of authority or has been violated in multiple ways, these arguments should be laid out in separate causes of action.

### IV. Conclusion

For the reasons stated above, defendants' motion for a more definite statement (Dkt. No. 28) and motion to dismiss (Dkt. No. 29) are GRANTED. The Court ORDERS as follows:

1. Claim I is dismissed with leave to amend, as explained above.

2. Claim XV is DISMISSED WITH PREJUDICE, in light of plaintiffs' non-opposition to dismissal thereof.

3. Claims X and XIV are DISMISSED FOR FAILURE TO STATE A CLAIM. Dismissal of these claims is WITHOUT PREJUDICE. *See Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1108 (9th Cir.2003) (Initial dismissal under Fed.R.Civ.P. 12(b)(6) should ordinarily be without prejudice).

4. Claims II through IX, XI through XIII, XVI through XVIII, and XX are DISMISSED FOR LACK OF SUBJECT MATTER JURISDIC-TION. Plaintiffs may file an amended complaint seeking to cure the jurisdictional deficiencies identified above.

5. Plaintiffs are granted twenty-eight (28) days from the date of this order to file an amended complaint.

IT IS SO ORDERED.